UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRIAN RICHARDSON, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:01CV1719 (EBB) |
| v. | : | |
| WILLIAM MIRANDA ET AL., | : | |
| Defendants. | : | |

**PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE
REGARDING DETAILS OF ARMED ROBBERY/POLICE CHASE
UNKNOWN TO DEFENDANTS AT THE TIME OF THEIR CONDUCT**

Pursuant to Rules 401 and 403 of the Federal Rules of Evidence, Plaintiff Brian
Richardson moves this Court to exclude evidence regarding certain details of an armed robbery
and ensuing police chase that occurred on April 22, 2001. Plaintiff does *not* move to exclude
testimony regarding details of this robbery and chase *actually heard by any of the three
Defendants* at the time of their conduct in question. Details unknown to the Defendants at the
time they acted, however, is irrelevant to their state of the mind, and its prejudicial value
substantial outweighs its probative effect.

I.    **Introduction/Facts**

This case involves allegations of excessive and unreasonable conduct by three police
officers of the Bridgeport Police Department. On the night of April 22, 2001, Plaintiff Brian
Richardson was involved in a robbery of Solmar's Restaurant in Bridgeport. After this robbery,
Mr. Richardson and three other individuals, fled the scene in a 1998 Ford Taurus driven by one
Jahi Foster-Bey. After police spotted the suspect vehicle, a police chase ensued throughout the

streets of Bridgeport.   The Taurus ultimately ended up in a residential neighborhood of Bridgeport, and after a foot chase Mr. Richardson was apprehended and arrested.  He pled guilty to three counts of first degree robbery and was sentenced to several years in state prison. Plaintiff is currently serving this sentence.

Plaintiff has initiated an assault claim against police officer Jose Reyes.  Mr. Richardson contends that Officer Reyes improperly shot at the suspect vehicle on that night.  Mr. Richardson has also instituted a battery and §1983 claim against officers William Miranda and Frank Delbouno.   He asserts that these officers used excessive force when they apprehended and arrested him on that night.  Mr. Richardson has also brought claims against all Defendants for intentional and negligent infliction of emotional distress.

The three Defendants testified at their depositions that they received information about the robbery and police chase on their radios prior to their encounter with Mr. Richardson.  *See, e.g.*, Reyes Dep. 13:24-14:15 (Ex. 1); Delbouno Dep. at 33:1-4 (Ex. 2); Miranda Dep. at 14:24-16:16 (Ex. 3).  Plaintiff now moves this Court to exclude evidence regarding *any other* details of the armed robbery and ensuing police chase not heard by the Defendants before their encounter with him.

## II.   Argument

### A.   Details of the Armed Robbery and Police Chase Unknown to the Three Defendants at the Time of Their Conduct Are Irrelevant.

Only relevant evidence is admissible at trial.  FED. R. EVID. 402.  Relevant evidence is defined as "evidence having any tendency to make the existence of any fact . . . more or less probable . . . ."  FED. R. EVID. 401.

Here, the sole focus on this case is whether the three officers acted appropriately under the circumstances on the night of April 22, 2001.   Consequently, Plaintiff concedes that it is

possible that the details about the armed robbery and ensuing police chase *actually given* to the officers over the radio dispatch may be relevant to this lawsuit.[1]  This information, arguably, helps the jury understand whether the Defendants, based on what they reasonably knew, acted appropriately under the circumstances.[2]

But the specifics about the robbery and the ensuring police chase *not given* to any the three Defendants have no relevance to this lawsuit.  In short, this information will not make the issue of whether Officer Reyes reasonably shot at the suspect vehicle or whether Officer Miranda or Delbouno used excessive force "more probable or less probable."  Since this information has no bearing on this case, this Court should exclude it.

**B.    This Testimony Should Be Excluded Based on Rule 403**

Even if this Court concludes that testimony regarding the specifics of the armed robbery and the subsequent police chase not relayed to the Defendants is relevant to this dispute, this testimony should be excluded because the "probative value is substantially outweighed by the danger of unfair prejudice . . . ." FED. R. EVID. 403.

This is *not* a case about Plaintiff's conduct before his encounter with the Defendants.  This is *not* a case about what crime Plaintiff may have committed and it is *not* a case about whether Mr. Richardson should be punished for his conduct.  Instead, the focus of this trial is only on the conduct of the three police officers that night, and whether those police officers acted

---

[1] In this regard, it bears note that Plaintiff is willing to stipulate that Defendants had reason to believe that he might be armed at the time they encountered him, even though Plaintiff himself contends that he was not armed.  Accordingly, evidence as to whether or not Plaintiff was, in fact, armed during the robbery is irrelevant and unnecessary.

[2] In this motion, Plaintiff does not seek to exclude details about the armed robbery and ensuing police chase that were actually given to any of the defendants before their encounter with Mr. Richardson.  Plaintiff, however, reserves the right to object to such evidence at trial.

appropriately under the circumstances. For this reason, the probative value of any information about the robbery and ensuing police chase not known by any of the Defendants at the time of their conduct is low, if not nonexistent. *See supra* at 2-3.

If the jury, however, were to hear about the specifics of the armed robbery and ensuing police chase, the unfair prejudice to Plaintiff would be substantial. Surely, vivid details about an armed robbery and a dangerous police chase will conjure negative images in the jury's mind about Mr. Richardson and detract from the jury's consideration of whether the officers acted appropriately on that night. This testimony, in short, would put undue negative attention on Plaintiff's character and prejudice his right to obtain a resolution of this lawsuit based solely on the evidence. *See United States v. Wacker*, 72 F.3d 1453, 1472 (10th Cir. 1996) (holding, in a criminal case, that district court should have excluded under Rule 403 "the nature and underlying circumstances" of defendant's crime because this "information tends only to color the jury's perception of the defendant's character, thereby causing unnecessary prejudice to the plaintiff").

## III.    Conclusion

For the foregoing reasons, Plaintiff respectfully asks this Court to exclude any evidence regarding the armed robbery and ensuing police chase not actually known to the three Defendants before their encounter with him on the night of April 22, 2001.

DATED: January 21st, 2005

Kenneth D. Heath (ct 26359)
WIGGIN AND DANA LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
Tel: 203-498-4400
Fax: 203-782-2889
E-mail: kheath@wiggin.com

Daniel Kalish (ct 24350)
PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Tel: 206-359-8000
Fax: 206-359-9000
E-mail: dkalish@perkinscoie.com

Attorneys for Plaintiff
Brian Richardson

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - x
                                     :
BRIAN RICHARDSON,
                                     :
                Plaintiff,
                                     : Civil Action
        vs.
                                     : No. 301CV1719
WILLIAM MIRANDA, FRANK DELBOUNO              (JCH)
and JOSE REYES,
                                     :
                Defendants.          :

- - - - - - - - - - - - - - - - - - x

            Deposition of JOSE O. REYES, taken

        pursuant to the Federal Rules of Civil

        Procedure, at the law offices of

        Wiggin & Dana, One Century Tower, New Haven,

        Connecticut, before Bonita Cohen, a

        Registered Merit Reporter and Notary Public

        in and for the State of Connecticut, License

        Number 00041, on Wednesday, November 12,

        2003, at 9:20 a.m.

A P P E A R A N C E S

WIGGIN & DANA LLP
Attorneys for the Plaintiff
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, Connecticut  06508-1832
(203) 498-4579
     By:  DANIEL KALISH, Esq.


OFFICE OF THE CITY ATTORNEY OF THE CITY OF BRIDGEPORT
Attorneys for the Defendants
999 Broad Street
Bridgeport, Connecticut  06604-4328
(203) 576-7647
     By:  BARBARA BRAZZEL-MASSARO, Esq.
          Associate City Attorney




A L S O   P R E S E N T

WILLIAM MIRANDA

FRANK DELBUONO, JR.

```
 1          A.    Antonio, A-n-t-o-n-i-o.

 2          Q.    Perez?

 3          A.    P-e-r-e-z.

 4          Q.    Do you know if he's still an officer?

 5          A.    Yes.

 6          Q.    He's an officer --

 7          A.    Yes.

 8          Q.    -- at the Bridgeport Police Department?

 9          A.    Yes.

10          Q.    He's a patrolman?

11          A.    Yes.

12          Q.    Had you had anything to drink on the 22nd of

13    April?

14          A.    No.

15                MS. BRAZZEL-MASSARO:  Objection to the

16                form.

17          Q.    Had you had anything alcoholic to drink on

18    the 22nd of April?

19          A.    No.

20          Q.    Had you taken any drugs?

21          A.    No.

22          Q.    How about any prescription medication?

23          A.    No.

24          Q.    Sergeant, when did you first hear that a

25    robbery had taken place?
```

1          A.    Towards the end of our shift, 11:30, 11:35.

2                Officer Feola came over the air and said

3     there were two cars chasing each other.

4          Q.    At this point, you and Officer Perez were at

5     Trumbull Gardens?

6          A.    It was towards the end of the shift.  We were

7     heading in.

8          Q.    Why don't you describe to me what happened

9     after you heard that report from Officer Feola.

10         A.    Well, basically, Officer Feola said he was

11    going to attempt to catch up to the vehicles and figure

12    out what was going on.

13               Being that he had started on Madison

14    Avenue -- we were already on Wood Avenue, heading in --

15    we figured they weren't going to come our way.

16         Q.    Were you driving the vehicle?

17         A.    No, I wasn't.

18         Q.    Officer Perez was?

19         A.    Yes.

20         Q.    Why was that?  Any particular reason?

21         A.    We had to fill out an evaluation sheet on the

22    recruit officers, and at the time that I had

23    Officer Perez, we also had to evaluate like driving

24    skills.

25               So he had to drive that night.

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - x
                            :

BRIAN RICHARDSON,

                            :

            Plaintiff,

                          : Civil Action No.

        vs.

                          : 3:01CV1719(JCH)

WILLIAM MIRANDA, FRANK DELBOUNO,
and JOSE REYES,

                          :

           Defendants.

                          :

- - - - - - - - - - - - - - - - - - x


        Deposition of FRANK DELBOUNO, JR., taken

pursuant to the Federal Rules of Civil

Procedure, at the law offices of Wiggin &

Dana, LLP, One Century Tower, New Haven,

Connecticut, before Lana Christino, License

No. 00258, a Notary Public in and for the

State of Connecticut, on Wednesday, November

5, 2003, at 11:30 a.m.

<u>A P P E A R A N C E S</u>

WIGGIN & DANA, LLP
Attorneys for the Plaintiff
One Century Tower
New Haven, Connecticut  06508
(203) 498-4400
        By:  DANIEL KALISH, Esq.


OFFICE of the CITY ATTORNEY
Attorneys for the Defendants
999 Broad Street
Bridgeport, Connecticut  06604-4328
(203) 576-7647
        By:  BARBARA BRAZZEL-MASSARO, Esq.



<u>A L S O   P R E S E N T</u>

WILLIAM MIRANDA (As noted)
JOSE REYES (As noted)

```
 1              After that I escorted him to my parole car
 2    where I was told to bring him to the detective bureau,
 3    at which time I did.  And I notified the medics who
 4    came to the detective bureau.  And I noted he had some
 5    cuts on his hands and I believe a cut on his head, and
 6    I think after that he was -- I had -- I didn't have any
 7    further contact with him after the detective bureau.
 8         Q.   I'm just going to go back and --
 9         A.   Okay.
10         Q.   -- ask you some more questions about it.  So
11    you first received I guess a dispatch over the radio
12    from Officer Feola?
13              MS. BRAZZEL-MASSARO:  Objection to the
14              form.
15              MR. KALISH:  Withdrawn.
16         Q.   Officer, again, why don't you tell me what
17    you -- what happened at 11:35 the first time you became
18    aware there was a robbery?
19         A.   Heard a radio broadcast from an officer.
20         Q.   It was Officer Feola?
21         A.   Yes.  Regarding two cars.
22         Q.   Hm-hmm.  And I guess as specifically as
23    possible what exactly do you remember he said?
24         A.   Um, I don't remember his exact words of what
25    he was calling out.
```

1      Q.    Did he say that it was an armed robbery?

2      A.    At some point it was stated it was an armed

3  robbery, yes.

4      Q.    So you first heard at 11:35 he said there was

5  a robbery, and at that point you tried to get the

6  location; is that correct?

7                MS. BRAZZEL-MASSARO:    Objection to the

8            form.    That's not what he said.

9      Q.    Again, Officer, I guess after you first heard

10  that broadcast, tell me what you did.

11     A.    Well, initially I monitored the broadcast to

12  see what direction of travel they were going in.    Then

13  I started proceeding to that area.

14     Q.    How do you monitor the broadcast?

15     A.    You listen to it on the radio.

16     Q.    And the officer told you what direction the

17  cars were going to?

18     A.    He was calling out the direction that the

19  vehicles were going, yes.

20     Q.    How far were you from the vehicles at that

21  point?

22     A.    I don't remember.

23     Q.    You started going in the direction that the

24  vehicles were going in?

25     A.    The general area.

1    Q.   Then did you receive follow-up information

2    from Officer Feola over the radio?

3    A.   It was basically he called out where the

4    direction was, he was following these vehicles, yes.

5    Q.   I mean he kept on giving additional reports

6    of the directions?

7    A.   Yes.

8    Q.   And how long did it take you to actually see

9    one of the cars involved in the chase?

10            MS. BRAZZEL-MASSARO:  Well, objection to

11            the form.

12   Q.   You can answer it.

13            MS. BRAZZEL-MASSARO:  If you can answer

14            it.

15   A.   I never saw the cars.

16   Q.   How long did it take you to go to the scene

17   where you first saw one of the cars involved in the

18   chase?

19            MS. BRAZZEL-MASSARO:  Objection to the

20            form.

21   Q.   You can answer.

22            THE WITNESS:  I can't answer it or I can

23            answer it?

24            MS. BRAZZEL-MASSARO:  If you can answer.

25            I objected to the form of the question.

1          A.    I just stated I never saw the cars.

2          Q.    So you went towards the direction that was

3    being told to you over the radio, and then what did you

4    do?  Why don't you describe that again?

5          A.    Okay.  After I heard where this pursuit

6    ended, I went to that area, not the exact area where

7    the cars were.  Short of where -- I don't know if you

8    want to say short of it, prior to it, before it, where

9    I saw Officer Miranda.

10         Q.    So you were in your car, and you saw Officer

11   Miranda on foot or in his car?

12         A.    When I saw him, he was on foot.  And I don't

13   recall if I saw him when I was in my car or if I got

14   out of my car and saw him.

15         Q.    Okay.  And what was Officer Miranda doing at

16   the time?

17         A.    He was on the -- uh, like, between two

18   houses, on the side of the street between two houses.

19         Q.    Did you see any other police cars?

20         A.    No, not that I recall.

21         Q.    And then what did you do after you saw

22   Miranda?

23         A.    He motioned to me, I believe he made a psst

24   [phonetic] sound motioning to me that, Come here.

25         Q.    How far were you away from Officer Miranda at

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - x
                                     :
BRIAN RICHARDSON,
                                     :
            Plaintiff,
                                     :   Civil Action
      vs.
                                     :   No. 3:01CV1719
WILLIAM MIRANDA, FRANK DELBOUNO,         (JCH)
AND JOSE REYES,                      :

            Defendants.              :

- - - - - - - - - - - - - - - - - - x


            Deposition of WILLIAM MIRANDA, taken

      pursuant to the Federal Rules of Civil

      Procedure, at the Law Offices of Wiggin &

      Dana, LLP, One Century Tower, New Haven,

      Connecticut, before Frances L. Doran, License

      No. 00192, Notary Public in and for the State

      of Connecticut, on Thursday, November 6,

      2003, at 9:10 a.m.

A P P E A R A N C E S

WIGGIN & DANA, LLP
Attorneys for the Plaintiff
One Century Tower
265 Church Street, 17th Floor
P.O. Box 1832
New Haven, Connecticut  06508-1832
        By:  KENNETH D. HEATH, ESQ.
             DANIEL KALISH, ESQ. (As Noted)


OFFICE OF THE CITY ATTORNEY
City of Bridgeport
Attorneys for the Defendants
999 Broad Street
Bridgeport, Connecticut  06604-4328
        By:  BARBARA BRAZZEL-MASSARO, ESQ.




A L S O    P R E S E N T

Frank Delbouno
Jose Reyes

1    that's pertinent for the police officers for that day.

2         Q.    Do you recall how long that lineup lasted?

3         A.    No.

4         Q.    Do you recall how long it generally lasts?

5         A.    15 minutes.

6         Q.    By the way, did you have a partner at this

7    time?

8         A.    Yes.

9         Q.    And who was your partner?

10        A.    Officer Tobin.

11        Q.    And Officer Tobin was a patrolman as well;

12   correct?

13        A.    Right.

14        Q.    Did you do your patrols in a car or were you

15   on foot?

16        A.    No, in a car.

17        Q.    In a car, okay.  So at what point did you go

18   out on patrol on the evening of the 22nd?

19        A.    The exact time I don't recall, but it was

20   right after lineup.  Lineup usually lasts 15 minutes.

21   Figure by 4:30 we're out, 16:30 hours.

22        Q.    I don't want to march through the entire

23   shift, but do you recall when you first became aware of

24   the incident that gives rise to this complaint which is

25   why we're here today?

1        A.    Yes.

2        Q.    Do you recall when that was, roughly, on that

3    night?

4        A.    Approximately 23:38 hours.

5        Q.    So almost at the end of your shift?

6        A.    That's correct.

7        Q.    Do you recall anything out of the ordinary

8    about your shift up until 23:38 hours?

9        A.    No.

10       Q.    Do you recall where you and Officer Tobin

11   were at 23:38 hours?

12       A.    Yes.

13       Q.    And where was that?

14       A.    We were in the area of the Brooklawn section

15   of Bridgeport which is probably north of North Avenue.

16       Q.    And were you just out patrolling in your car

17   at that point?

18       A.    We were actually making our way into patrol

19   to book off.

20       Q.    So you were about to go home?

21       A.    That's correct.

22       Q.    Okay.  How did you become aware at 23:38

23   hours of the incident that gave rise to this case?

24       A.    There was a broadcast through Officer Feola

25   stating that he observed two vehicles driving a bit

1    erratic down, I believe, Madison Avenue almost striking

2    his vehicle.  He stated that he followed the vehicle in

3    an attempt to stop him to see what was going on.  He

4    activated his lights.  They refused to stop.  He

5    started to give the direction of travel.  When he gave

6    the street, I became aware that he was coming toward

7    the direction -- they were coming toward the direction

8    that we were in in that general area.  Later it was

9    revealed through our supervisor, our communications

10   supervisor that there was a commercial robbery that

11   just took place, that the vehicle in front, which was a

12   black car, was the suspect vehicle, and a red -- small

13   red truck was the victim.  That's when we became aware.

14        Q.   When you say that later you became aware that

15   there had been a commercial robbery, how much later

16   then 23:38 hours, do you recall?

17        A.   Seconds.

18        Q.   Okay.  So just to make sure I understand what

19   you've just said, it sounds as though Officer Feola

20   himself made the dispatch over the radio as to what he

21   had seen on the road; is that right?

22        A.   I believe he called the radio dispatch if

23   they were aware of any incidents pertaining to this

24   erratic driving.  He responded that -- and I'm reading

25   from his report -- that he gave chase.  He followed

1    these vehicles in an attempt to see what was going on.

2    A short time later the cat sergeant or communications

3    sergeant came over stating that it's a possibility that

4    might be the victim and the suspect of a commercial

5    robbery.

6        Q.    And all I'm trying to get at is when you were

7    sitting in the car and dispatch came over the radio,

8    was that Officer Feola or the cat sergeant?

9        A.    The first voice was Officer Feola.

10       Q.    So Officer Feola makes the initial report

11   that you hear and indicates that they're coming your

12   way?

13       A.    Absolutely, yes.

14       Q.    And a short time later the cat sergeant comes

15   over dispatch and indicates there's been a robbery?

16       A.    Correct.

17       Q.    At that point would it be fair to say that

18   you assume the car chase Feola was involved in happened

19   to be related to the robbery that the cat sergeant had

20   reported?

21       A.    It was probable.

22       Q.    But you weren't sure at the time?

23       A.    We weren't sure.

24       Q.    By the way, Officer Feola, is that Pasquale

25   Feola?

CERTIFICATE OF SERVICE

On January 21st, 2005, I caused to be served upon counsel of record, at the address stated

below, via the method of service indicated, a true and correct copy of the foregoing:

Barbara Brazzel-Massaro, Esq.
City Attorney's Office, City of Bridgeport
999 Broad Street
Bridgeport, CT 06604

|  | Via hand delivery |
| --- | --- |
| **X** | Via U.S. Mail, 1st Class, Postage Prepaid |
|  | Via Overnight Delivery |
| **X** | Via Facsimile |
|  | Via E-filing |

I certify under penalty of perjury under the laws of the State of Connecticut that the

foregoing is true and correct.

DATED at New Haven, CT, this 21st day of January, 2005.

Kenneth D. Heath