FILED

2005 FEB -7 P 2: 29

U.S. DISTRICT COURT
NEW HAVEN, CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIAN RICHARDSON          :
                          :
        Plaintiff,        :   CIV. NO. 3:01CV1719 (EBB)
                          :
vs.                       :
                          :
WILLIAM MIRANDA, ET AL    :
                          :
        Defendants        :   JANUARY 31, 2005

## MOTION IN LIMINE CONCERNING TESTIMONY OF WILLIAM MAYER AND TESTIMONY OF A "BULLET HOLE" OR TRAJECTORY BY ANY WITNESS

The Plaintiff has disclosed as a witness for his case in chief William Mayer. The Plaintiff indicates he "will testify as to his processing of the car in which Mr. Richardson was a passenger on April 22, 2001."

The Defendants, at this time, request that the Court strictly limit the testimony of William Mayer to authenticating photographs that he took of the vehicle as his assignment for processing the car that was involved in the pursuit. William Mayer was deposed by the Plaintiff on October 10, 2003, at which time he testified that his sole responsibility in the criminal investigation was "to take photographs of the vehicle both from the exterior and interior" of the car (Exhibit A – Deposition of Sergeant Mayer at page 54).

William Mayer is a Sergeant for the Bridgeport Police Department. The Plaintiff's Subpoena and Notice of Deposition for Sergeant Mayer requested that he bring with him "any and all correspondence, photographs, notes, memorandum or

BMF05015                          1

reports relating to Detective Mayer's inspection of the Ford Taurus (Vehicle Identification Number IFAFP52U4WA242234) on April 23 2001 (see attached report by Detective William Mayer)." During the course of the deposition, Sergeant Mayer testified concerning approximately 37 photographs that he took of the vehicle while it was at the Bridgeport Police Department (Exhibit B – pages 31-41).

Sergeant Mayer did not testify that he had ever gone to the scene of the final accident or to the street where Mr. Richardson alleges several shots were fired at his car. Sergeant Mayer described his job regarding this criminal case as photographing the vehicle. He stated that he takes overall photographs of the car and anything he feels is unusual or remarkable about a vehicle (Exhibit C – Deposition of Mayer at page 21-23). In this case he testified that his duty was to photograph and document the vehicle in the garage (Exhibit D – Deposition of Mayer at page 29). He indicated that his training involved examining objects at crime scenes to photograph but it did not provide training on how to investigate or examine automobiles. It was training to photograph and document a crime scene, identify evidence and collect evidence (Exhibit E – Deposition of Mayer at page 14). In any report he was trained to "stick to objective facts." (Exhibit F – Deposition of Mayer at pages 15-16). In this regard it is very obvious that the duties of Sergeant Mayer were simply to take the photographs of the vehicle before it was released. There is absolutely nothing n his deposition that indicates he was trained, qualified or, if so, performed the appropriate analysis to determine that the hole in the right front fender

BMF05015

2

was a "bullet hole" or that he is qualified or, if so, there is sufficient evidence to determine any trajectory of a bullet hole in the right front fender.

In particular, when Sergeant Mayer was first asked by Attorney Kalish "Is it your conclusion, Officer, that someone shot at the Ford Taurus" he responded: "No" (Exhibit G – Deposition of Mayer at page 50). Thereafter, he was asked "Is it your conclusion that a bullet went through the Ford Taurus" he responded "No" (Exhibit G). Again, after reading his report, Plaintiff's counsel asked him against "Is it your understanding, Sergeant that a bullet entered the Ford Taurus" and he responded "It's my understanding that one did go through it. I can't say conclusively." (Exhibit H – Deposition of Mayer at page 51). Thereafter, a colloquy ensued in an effort to convince him it was a bullet hole.

In Montalvo v. Mantello, 233 F. Supp. 2d 554 (2002), the court determined that a ballistics expert was needed to match a bullet from the chest of the victim to the gun of a suspect. In the instant action, no one actually did an analysis to determine if the hole was caused by the gun of Sergeant Reyes. Everyone assumed he shot, there was a hole, it must have been his shot that caused the hole. However, there are a myriad of reasons as to why there is a hole or as to what happened to the shot fired by Sergeant Reyes. Given this gap, the Defendants respectfully request that no testimony or evidence form any person can be given classifying this as a "bullet hole."

However, specifically given the lack of training and the inability of Sergeant Mayer to testify to anything other than that this was a hole in the side of the car, the

BMF05015                              3

Court should preclude any inquiry into the area of what caused the hole in the vehicle. Even if the Court permits him to testify that the hole may be a bullet hole, Sergeant Mayer also stated specifically that he could not determine whether the hole was from a nine millimeter weapon (Exhibit I – Deposition of Mayer at page 53). Given this lack of connection and lack of expertise, it is impossible for this witness to provide testimony that this hole, even if it is from a bullet, was from the weapon of Sergeant Reyes.

The last area of inquiry in which the Plaintiff attempted to elicit testimony of the Detective appeared to be some type of trajectory of the supposed bullet hole. Assuming that the Court permits testimony that it appears to be a bullet hole, the Defendants object to any inquiry from Sergeant Mayer as to the trajectory of the bullet or photographs which Plaintiff alleges demonstrate a trajectory as the Plaintiff attempted to do at the time of the deposition.

The courts have ruled that testimony and evidence concerning trajectory requires the testimony of an expert. Gates v. City of Memphis, 2000 U.S. App. Lexis 6713 (April 6, 2000). In the instant case there is absolutely no basis to believe that Sergeant Mayer has an expertise in the study of establishing the trajectory of an object. Counsel for the Plaintiff failed to develop this expertise or notify counsel of his use as an expert if he intends to inquire into that area. In particular, he testified at his deposition that he received training in how to photograph, how to collect evident such as shell cases, and how to label and secure them for a criminal case (Exhibit J – Deposition of Mayer at page 16). The Plaintiff made some inquiries

BMF05015                              4

using the word trajectory but the response by Sergeant Mayer fell short of establishing a basis for determining a trajectory of the so-called bullet hole. He could not provide a distance for the shooter even assuming the hole in the car was from a nine millimeter (Exhibit I – Deposition of Mayer at page 53). He could not draw conclusions about the distance of the shooter from the car in viewing the scale in the photographs (Exhibit I). There was absolutely no questioning about the position or location of a suspected shooter or about the surroundings or the direction or speed of travel of the car. The Plaintiff failed to determine if Sergeant Mayer has an education in physics or other related fields to determine trajectory with two moving points of reference.

The Plaintiff, through his questioning, has attempted to set forth a theory about the trajectory of the bullet in relation to the car and how it hit the car. Sergeant Mayer described this angle only as front to back. No other reports refer to the shot as "front and back." There is also no explanation of what is meant by front to back or whether the statement in the report of Mayer that "The trajectory (sic) of the bullet appeared to have traveled from the rear of the vehicle to the front" is substantiated This very sentence is merely a subjective or speculative comment. The words "appears to be" has no legal significance and demonstrates a lack of any reasonable certainty. The Plaintiff has no specifics to establish this theory.

Even if the Court is to determine from the scarce background information of Sergeant Mayer that he had some knowledge of bullet trajectory, there is absolutely no evidence or testimony that at the time of the examination he did any more

BMF05015

5

analysis than take photographs of the vehicle and its contents. The instant action is not the same as an analysis when the examiner has gone to the scene and can utilize fixed points. This case is very different because the undisputed testimony is that the shot was fired at a moving car and by an individual who was behind a car door and stepping back. No one has determined the specific location of Sergeant Reyes nor the automobile at the time of the shot being fired. Sergeant Mayer never went to the scene. This complicated set of facts requires that any determination of trajectory for the shots fired should be by an expert.

Rule 702 of the Federal Rules of Evidence provides three areas of inquiry as to determination of an expert:

"**Rule 702. Testimony by Experts**

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. (Pub. L. 93-595, § 1, Jan. 2 1975, 88 Stat. 1937; Apr. 17, 2000, eff. Dec. 1, 2000.)"

In the instant action the photography of the car for purposes of "documentation" does not satisfy any of the three criteria set forth in this Rule. This action involves moving vehicles and people. It is not a simple Point A to Point B. In this regard, the factors are more akin to <u>Richmond Marine, et al v. United States</u>,

350 F. Supp. 1210 (1972) where an expert was required to determine the positioning of a vessel in moving waters. A portion of the expert testimony was mathematical computations to determine the displacement of the vessel, the relationship between the terminal slip speed, water resistance and direction and speed conditions along with other facts to arrive at a trajectory. Although the instant action is not quite as complicated as <u>Richmond</u>, the situation at hand is involved with more than two simple points of reference and a proper review of trajectory has been totally ignored in the "documentation."

The Court here has the task of determining a proposed expert's testimony that rests on reliable foundation and is relevant to the task at hand. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 597, 113 S. Ct. 2786 (1996). This Court, in its discretion, can determine that such testimony is not based upon professional studies in the relevant field and, as such, precludes testimony or evidence of that nature.

Lastly, Sergeant Mayer has not been disclosed as an expert or as a witness to testify to such a line of inquiry and, for that reason also, he should be limited in his testimony.

Whether the Court grants this motion, the Defendants would also request that testimony or reports from any person that recites the information as to the "bullet hole" and/or "trajectory" not be permitted for the same reason as well as the fact that such information would be hearsay.

THE DEFENDANTS

By: /s/ Barbara B. Massaro
Barbara Brazzel-Massaro
Associate City Attorney
OFFICE OF THE CITY ATTORNEY
999 Broad Street - 2nd Floor
Bridgeport, CT 06604
Tel: #203/576-7647
Fed. Bar #05746

## CERTIFICATION

This is to certify that a copy of the foregoing "Motion in Limine Concerning Testimony of William Mayer" has been mailed, postage prepaid, on this 31st day of January, 2005, to:

**Kenneth D. Heath, Esq.**
**Wiggin & Dana**
**One Century Tower**
P.O. Box 1832
New Haven, CT 06508

**Daniel Kalish, Esq.**
**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099

/s/ Barbara B. Massaro
Barbara Brazzel-Massaro

BMF05015                                8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - x
BRIAN RICHARDSON,            :
                             :
         Plaintiff,          :
                             : Civil Action No.
                             : 3:01CV1719(JCH)
WILLIAM MIRANDA, ET AL,      :
                             :
         Defendants.         :
- - - - - - - - - - - - - - - - - - x

     Deposition of SERGEANT WILLIAM ROBERT MAYER, taken pursuant to the Federal Rules of Civil Procedure, at the law offices of Wiggin & Dana, One Century Tower, New Haven, Connecticut, before Michelle E. Pappas, License #00081, a Notary Public in and for the State of Connecticut, on Friday, October 10, 2003, at 9:21 a.m.

SCRIBES, INC.



EXHIBIT A

```
 1                    MS. BRAZZEL-MASSARO:  I have very few
 2          questions.
 3   CROSS-EXAMINATION
 4   BY MS. BRAZZEL-MASSARO:
 5       Q.  Sergeant, was your sole responsibility in
 6   this particular criminal investigation to take
 7   photographs of the vehicle both from the exterior and
 8   interior?
 9       A.  Yes.
10       Q.  Okay.  And did you learn anything at all
11   about the facts and circumstances surrounding the
12   incident which brought that car to the police garage?
13       A.  No.
14                    MS. BRAZZEL-MASSARO:  No further
15          questions.
16                    MR. KALISH:  Sergeant, thank you for
17          your time.
18                    (Time noted:  10:51 a.m.)
19         (Jurat follows on page 55, no omission.)
20
21
22
23
24
25
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - x
                                     :
BRIAN RICHARDSON,
                                     :
                Plaintiff,
                                     :
                                : Civil Action No.

                                : 3:01CV1719(JCH)
WILLIAM MIRANDA, ET AL,
                                     :
                Defendants.
                                     :
- - - - - - - - - - - - - - - - - - x


        Deposition of SERGEANT WILLIAM ROBERT MAYER, taken pursuant to the Federal Rules of Civil Procedure, at the law offices of Wiggin & Dana, One Century Tower, New Haven, Connecticut, before Michelle E. Pappas, License #00081, a Notary Public in and for the State of Connecticut, on Friday, October 10, 2003, at 9:21 a.m.


                          SCRIBES, INC.

EXHIBIT B

```
 1   you been officially assigned to the case?
 2        A.   No, I was just -- no, I was assigned just to
 3   document the car.
 4        Q.   And how long did it take to you examine the
 5   car?
 6        A.   Maybe an hour, hour and a half.  I can't say
 7   specifically.
 8        Q.   And did you look at the exterior of the car?
 9        A.   Yes.
10        Q.   Did you look at the interior of the car?
11        A.   Yes.
12        Q.   Did you look under the car?
13        A.   I believe one of the wheel wells I did, yes.
14   The wheel wells I -- yes, I did, because there was
15   damage to the axle.
16        Q.   Did you look under the hood?
17        A.   I don't believe so.
18        Q.   If I could show you Plaintiff's Exhibit No.
19   2, you can look at that to refresh your recollection,
20   but as far as you remember, can you please describe to
21   me the damage to the exterior of the car?
22        A.   Well, as it says here in the report, there
23   was heavy front end damage, the axle, the front axle
24   and wheel were destroyed.  There was damage on the left
25   side of the vehicle and the rear end.
```

```
 1         Q.   Is there anything about the damage to the
 2   exterior that you remember that's not included in that
 3   report?
 4         A.   Not that I can remember.
 5         Q.   Can you please describe to me the condition
 6   of the interior of the car?
 7         A.   The interior of the car, I know both the air
 8   bags were deployed, there was items in the car
 9   scattered about, it was a set of the keys on the front
10   seat.
11         Q.   Sergeant, is there anything that you remember
12   about the condition of the interior of the car that's
13   not included in your report?
14         A.   I can't say.  I don't remember.
15         Q.   Sergeant, you wrote down in your report that
16   you felt the interior of the car was in disarray as far
17   as you can remember.  Can you be more specific on
18   exactly what you meant by the word "disarray"?
19         A.   Basically what I meant, there was items in
20   and about the car, they weren't in neat order, there
21   was things in the, on the floor in the backseat, there
22   was some articles of clothing strewn across the seats.
23         Q.   Sergeant, if I could have you look at
24   Plaintiff's Exhibit No. 3, please.  Basically, I'd just
25   like to go through these photographs, just go through
```

SCRIBES, INC.

1  them.  Could you describe to me exactly what is
2  contained in the photograph designated as No. 1?
3       A.   It's a picture of a headband with a case
4  number above it.
5       Q.   And do you remember if that headband was
6  found in the front seat or backseat?
7       A.   I don't remember offhand, I'd have to refer
8  to the photographs.
9       Q.   And how about Photograph No. 2, what exactly
10 is that a photograph of?
11      A.   That is also a picture of a headband.
12      Q.   Is that the same headband in Photograph No.
13 1?
14      A.   I believe it is.
15      Q.   If you could go to Photograph No. 3, what
16 exactly is that a picture of?
17      A.   That is a picture of a blue kerchief inside a
18 plastic evidence bag.
19      Q.   Do you remember where you found that piece of
20 evidence?
21      A.   I believe it was in the vehicle.  I don't
22 know exactly where offhand.
23      Q.   How about Document No. 4, what exactly is
24 that?
25      A.   I'm not sure what that is.

1  Q.  Document No. 5?

2  A.  Document No. 5?

3  Q.  I'm sorry, Photograph No. 5.

4  A.  Photograph No. 5 appears to be the blue
5  kerchief that I mentioned before.

6  Q.  Okay.  Photograph No. 6?

7  A.  Appears to be a white doo-rag.

8  Q.  Do you remember where you found that doo-rag?

9  A.  No, I do not.

10 Q.  Photograph No. 7?

11 A.  Appears to be a orange and blue shirt.  It
12 appears to be the one that was in the vehicle.

13 Q.  Do you remember where you found that shirt?

14 A.  I don't, I have to refer to the photographs.
15 I believe it was on the backseat, but I can't say with
16 certainty.

17 Q.  How about photograph No. 8, please?

18 A.  No. 8 was a black and gray knit cap in a
19 plastic evidence bag.

20 Q.  Do you know where you found that?

21 A.  It was found on the front seat.  I believe on
22 the passenger seat.

23 Q.  Photograph No. 9, Sergeant, can you explain
24 what that is, please?

25 A.  It appears to be a white -- excuse me.  It's

```
 1    a blue or gray South Pole shirt.
 2         Q.   Do you remember where you found it?
 3         A.   It was in the vehicle somewhere.
 4         Q.   Photograph No. 10?
 5         A.   Appears to be a dark blue Sean John shirt.
 6         Q.   Do you remember where you found that?
 7         A.   It was found in the vehicle.
 8         Q.   Do you know specifically where?
 9         A.   Not specifically, no.
10         Q.   Photograph No. 12, please?
11         A.   It's a photograph of a, of a gray and black
12    knit cap.
13         Q.   Photograph No. 12?
14         A.   That's a picture of the case number by
15    Detective Teixeira.
16         Q.   And Photograph No. 13, please?
17         A.   That is a photograph of the backseat of the
18    vehicle.
19         Q.   As far as you understood, Sergeant, had
20    anybody moved any of the items in the vehicle prior to
21    you examining it?
22         A.   Prior, no, not prior, that I know.
23         Q.   And Photograph No. 14, please?
24         A.   That is the rear seat of the vehicle, I
25    believe the driver's side.  Shows a black, dark blue or
```

SCRIBES, INC.

```
 1    black kerchief, some tools on the floor, and No. 2
 2    marker.
 3         Q.   Why is the No. 2 marker placed there?
 4         A.   Because when examining the vehicle it was
 5    brought to our attention it was used in a robbery.
 6    It's very common for people who commit robberies to
 7    wear something over there heads or face to hide their
 8    identity.
 9         Q.   How about Photograph No. 15, please?
10         A.   15 is, I believe it's showing the front
11    driver side door.
12         Q.   And can you tell what's contained in that
13    pocket there?
14         A.   Appears to be some type of paperwork.
15         Q.   How about Photograph No. 16?
16         A.   16 again is the rear seat showing more
17    visible the blue and orange shirt.
18         Q.   Photograph No. 17?
19         A.   It's the exterior view of the vehicle showing
20    the passenger side from the front angle.
21         Q.   Is that hole in the car, is that a bullet
22    hole, as far as you recall?
23         A.   We believe it to be, yes.
24         Q.   And what is that sticking out of the car?
25         A.   It's a fiberglass or wooden dowel that was
```

```
 1        stuck in the hole.
 2             Q.   Did you stick that in there?
 3             A.   I believe I did, yes.
 4             Q.   Why?
 5             A.   First of all, to give dimension to where the
 6        photograph is, to show where it is, to possibly show a
 7        direction.
 8             Q.   Photograph No. 18?
 9             A.   That is showing -- that is the front
10        passenger side of the vehicle showing partial air --
11        partial photograph of the air bag that's deployed, and
12        there's red tape on the floor and the door's open.
13             Q.   Photograph No. 19, please?
14             A.   It is a medium view of the right front fender
15        of the vehicle showing the tire deflated.
16             Q.   Was that the same fiberglass dowel sticking
17        out that you had mentioned previously?
18             A.   Yes.
19             Q.   Photograph No. 20, please?
20             A.   Again, that is another angle of 19 from the
21        rear end of the vehicle, looking at it.
22             Q.   Photograph No. 21, please?
23             A.   It is a close-up of the bullet hole in the
24        vehicle with a scale attached.
25             Q.   With a what attached?
```

1    A.    Scale attached.

2    Q.    Scale showing?

3    A.    It's a stick-on paper scale underneath the
4    hole.

5    Q.    And why did you stick that there?

6    A.    Because that's standard procedure whenever
7    you're photographing any type of hole or damage like
8    that, in case you need a one-on-one photograph later.

9    Q.    What's the purpose of the scale?

10    A.    So if you want to enlarge the photographs
11    later and give it a one-to-one real life schedule, plus
12    gives you a dimension on the hole.

13    Q.    Photograph No. 22, please?

14    A.    Again, that's the same hole with the wooden
15    or fiberglass dowel under it from a more closer angle
16    from the front of the vehicle.

17    Q.    Photograph No. 23, please?

18    A.    Again, that's another view of the right front
19    fender showing the hole.

20    Q.    Photograph No. 24, please?

21    A.    Again, that's a medium shot of the bullet
22    hole.

23    Q.    Photograph No. 25, please?

24    A.    It's an overall photograph of the left side
25    of the vehicle.

SCRIBES, INC.

```
 1      Q.   Photograph No. 26, please?
 2      A.   That is another view of the right front
 3  fender showing the hole.
 4      Q.   Photograph No. 27, please?
 5      A.   It is an overall rear view of the vehicle
 6  showing the license plate.
 7      Q.   Photograph No. 28, please?
 8      A.   It is another photograph, overall photograph
 9  of the vehicle from the rear end showing the driver's
10  side.
11      Q.   Photograph No. 29, please?
12      A.   It is another photograph of the right front
13  fender, more overall of the wheel and fender.
14      Q.   Photograph No. 30, please?
15      A.   Is a -- 30 is a close-up of the license plate
16  of the vehicle on the rear end.
17      Q.   Photograph No. 31, please?
18      A.   Is a photograph of the front of the vehicle.
19      Q.   Photograph No. 32, please?
20      A.   Is another photograph of the front of the
21  vehicle from the passenger side angle.
22      Q.   Photograph No. 33, please?
23      A.   It is a close-up of the right front tire.
24      Q.   Photograph 34?
25      A.   It is a medium shot of the passenger side of
```