# Exhibit E

Westlaw.

503 F.2d 173                                                           Page 1
503 F.2d 173, 164 U.S.App.D.C. 82
**(Cite as: 503 F.2d 173, 164 U.S.App.D.C. 82)**

▷

United States Court of Appeals, District of Columbia Circuit.

UNITED STATES of America
v.
Aubrey E. PIERSON, Appellant.

No. 73-1831.

Argued June 7, 1974.
Decided Aug. 28, 1974.

Defendant was convicted in the United States District Court for the District of Columbia, June L. Green, J., of armed robbery and of carrying a dangerous weapon, and he appealed. The Court of Appeals, Jameson, District Judge, held that permitting police officer to testify regarding direction from which bullet in wall was fired did not constitute an abuse of discretion.

Affirmed.

West Headnotes
**[1] Criminal Law** ⇐449.1
110k449.1 Most Cited Cases
(Formerly 110k449(1))
Expertise as a basis for an opinion is required only when the inferences to be drawn from given facts demand knowledge not generally possessed by the average layman.
**[2] Criminal Law** ⇐448(1)
110k448(1) Most Cited Cases
**[2] Criminal Law** ⇐1153(1)
110k1153(1) Most Cited Cases
Trial judge should have broad discretion in deciding whether or not to permit opinion testimony, and only a clear abuse of discretion will justify reversing trial court's admission of opinion evidence.
**[3] Criminal Law** ⇐459
110k459 Most Cited Cases
Permitting police officer to testify regarding direction from which shot causing bullet hole in wall was fired did not constitute an abuse of discretion in prosecution for armed robbery and for carrying a dangerous weapon. D.C.C.E. §§ 22-2901, 22-3202, 22-3204.
**[4] Criminal Law** ⇐1169.2(8)
110k1169.2(8) Most Cited Cases
Assuming for purposes of argument that testimony of police officer regarding direction from which bullet in wall was fired was inadmissible, admission of such testimony was not prejudicial where, viewing the evidence as a whole, officer's opinion testimony after cross-examination was of very little probative value, and where, excluding such testimony, there was substantial evidence to justify conviction.

*173 **82 Patrick J. Moran, Washington, D.C. (appointed by this Court), for appellant. George P. Lamb, Jr., Washington, D.C. (appointed by this Court), was on the brief for appellant.

James M. Hanny, Asst. U.S. Atty., with whom Harold H. Titus, Jr., U.S. Atty., at the time the brief was filed, John A. Terry and Barry W. Levine, Asst. U.S. Attys., were on the brief for appellee.

*174 **83 Before WRIGHT and MacKINNON, Circuit Judges, and JAMESON, [FN*] United States Senior District Judge for the District of Montana.

    FN* Sitting by designation pursuant to 28 U.S.C. § 294(d).

JAMESON, District Judge:

Appellant, Aubrey E. Pierson, was convicted of armed robbery and carrying a dangerous weapon in violation of 22 D.C.Code §§ 2901, 3202 and 3204. [FN1] He contends that the district court erred in permitting a witness to give his lay opinion regarding the direction of a bullet fired into a wall at the scene of the alleged crime.

    FN1. A prior trial resulted in a mistrial when the jury could not agree on a verdict.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

503 F.2d 173                                                                                                Page 2
503 F.2d 173, 164 U.S.App.D.C. 82
(Cite as: 503 F.2d 173, 164 U.S.App.D.C. 82)

According to the Government's evidence, at approximately 3:00 A.M. on January 23, 1971, Ted J. Williams, an off-duty police officer, was working as night auditor at the Diplomat Motel in Washington, D.C. Prior to auditing the day's receipts, he left his desk in the motel lobby to get a coke from a machine in an adjoining hallway. After getting the coke, he saw a man, later identified as appellant, walking toward him with a gun in his hand. Appellant placed the gun in the small of Williams' back and directed him to the area of the cash register. Upon reaching the cash register, appellant ordered Williams to open the cash drawer. After Williams had done so, appellant placed his gun in his pocket, reached into the cash register with both hands and removed approximately $500.00.

Williams started to reach for his own gun, a .38 caliber revolver. [FN2] Upon seeing Williams' movement, appellant removed his gun from his pocket and said 'Don't do it'. Williams grabbed appellant's right hand and during the ensuing struggle one shot was fired. Appellant broke loose and fired at williams but missed. [FN3] As appellant moved toward the rear door, from which he had entered, Williams fired at him and appellant grabbed the small of his back and cried, 'Oh, My God.' Williams fired a total of six shots, [FN4] and it was later found that appellant was struck in the left jaw, hand, foot, and pelvis.

> FN2. Williams was required by the Police Department to carry his weapon at all times while off duty.

> FN3. Williams identified appellant's gun as a .25 or .32 caliber automatic pistol and testified that appellant fired three or four shots.

> FN4. After this type of weapon is discharged the shell casing remains in the chamber.

Williams telephoned the police. In response to a radio call, Officer James Money arrived shortly after appellant left. He inspected the lobby area and found a trail of blood leading from the desk area through the lobby to the back door (through which appellant entered and departed), blood on a door handle, and a human tooth on the floor. He observed a bullet hole approximately 14 feet up the wall and another in a filing cabinet. He testified that in his opinion the bullet entering the wall was fired from the central portion of the motel lobby.

An officer of the Metropolitan Police Crime Laboratory removed blood scrapings from the counter inside the office door. [FN5] He also found blood on the outside of the door leading to the parking area, four .32 caliber shell casings and lead fragments inside the office area, and what appeared to be bullet holes in the ceiling. [FN6]

> FN5. It was later stipulated that these scrapings and appellant's blood were both type O.

> FN6. The officer took a number of photographs and made a diagram indicating the location of the blood stains, tooth, shell casings and lead fragments. The blood trail led from the office area to the outer door.

The lessee of a dining room and lounge in the Diplomat Motel testified that he heard what sounded like gun shots and a man shouting 'Halt' coming from the lobby area. [FN7] Through glass doors dividing *175 **84 the lounge area from the lobby, he saw a man running towards the back door 'reaching for himself' with his right hand.

> FN7. He testified further that 'there was * * * a sharper sound and one that wasn't really as sharp. I am talking about six, seven shots'. He recognized Williams' voice saying 'Halt'.

Following an anonymous phone call and photographic identification, a warrant was obtained for appellant's arrest on January 29, 1971. The arresting officer was informed by two women that appellant did not live at the address given, but upon entering the premises, the officer found appellant hiding in a bedroom closet. He was admitted to the District of Columbia General Hospital and treated for his gunshot wounds. The chief of the Hospital's dental department examined the tooth recovered at the motel and found that it fit into the configuration of appellant's left molar root.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

503 F.2d 173  
503 F.2d 173, 164 U.S.App.D.C. 82  
**(Cite as: 503 F.2d 173, 164 U.S.App.D.C. 82)**

Page 3

Appellant admitted that he was present at the Diplomat Motel, but testified that he was there to purchase narcotics from Williams. He claimed that he had met Williams at the residence of Francis Harper, since deceased, and had arranged to purchase narcotics from Williams through Harper. He was aware that Williams 'was protecting people who were hustling'. He knew that Williams had access to narcotics taken from various persons on the street.

Appellant testified that a meeting had been scheduled with Williams between 2:45 A.M. and 3:00 A.M. He was driven to the Diplomat Motel by Billie Robinson in Robinson's car. [FN8] He entered the side door of the motel lobby and noticed Williams standing by a vending machine. After identifying himself, appellant stated that it was his understanding that he would receive 'sixteen spoons of heroin' from Williams. Harper had previously given Williams $1,500 of appellant's money in payment of the heroin. Appellant and Williams walked to the office area. 'At this point he didn't produce what I came after and we got into a little argument.' As appellant walked toward the front door, he noticed a gun in Williams' hand. Appellant lunged toward Williams but was shot in the jaw. He threw up his arm and was shot in the hand and then the foot. He then ran out of the motel, got into the car and drove home. [FN9]

> FN8. Robinson was not called as a witness and appellant had made no effort to locate him.

> FN9. He made no effort to pick up Robinson, who was in a doughnut shop across the street.

Appellant denied having a gun in his possession or owning an automatic pistol on January 23, 1971. He denied that he had taken any money from the cash drawer. He testified that when he left the motel he had between $1,300 and $1,400 he had earned and saved. Appellant admitted on cross-examination that he had told a doctor on admission to the hospital that he 'got shot in a robbery'. [FN10]

> FN10. He explained that this 'was to stop him from asking me a whole lot of unnecessary questions because at this time I had never been given a privilege to speak to my attorney'.

The sole issue on this appeal is whether the district court abused its discretion in permitting Officer Money to testify regarding the direction from which the bullet hole in the wall was fired. He was asked for his lay opinion as to whether he was 'able to tell the direction by which (the bullet) went into the wall'. Over defendant's objection he was permitted to answer, responding: 'From the angle where I saw the holes, from in this area somewhere', indicating the area of the diagram. The examination continued:

'Q What are you pointing to that area for? That is what?

'A. The hallway. This is the hallway.

'Q I ask you, In what direction was the bullet fired?

'A From this area here.

'Q That would be in the central portion of the lobby near the steps?

'A Yes, sir.'

Defendant's counsel renewed his objection on the ground that 'there has been no foundation laid with regard to this officer's expertise in trajectory of bullets' and it was 'not within the province of this police officer to give that *176 **85 kind of an opinion, that he is not an expert'. In overruling the objection the court said: 'A layman, under certain circumstances, can look at a wall and see whether it appears to come from one direction or another. Certainly this isn't possible if it is straight in * * * You (defense counsel) surely may examine him on his expertise.'

On cross-examination Money testified that he was unable to tell what caliber slug caused the hole in the wall and that in his lay opinion there would have been no way to tell what caliber slug had made it. He was cross-examined extensively regarding the hole in the file cabinet, [FN11] testifying in part:

> FN11. The Government had not examined Money regarding the direction from which

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

503 F.2d 173 Page 4
503 F.2d 173, 164 U.S.App.D.C. 82
(Cite as: 503 F.2d 173, 164 U.S.App.D.C. 82)

the bullet was fired into the file cabinet.

'Q Now, getting back to the bullet hole in the file cabinet, could you tell where that bullet came from?

'A A lay opinion, yes.

'Q In your lay opinion, where did it come from?

'A Outside the counter area.' [FN12]

> FN12. He testified further that he did not find the lead slug and could not tell what caliber weapon made the hole or crease in the cabinet; that it could have been a .38 caliber weapon or a .32 caliber weapon.

Appellant contends that (1) only a qualified expert could testify regarding the trajectory of a bullet; (2) Money's testimony was inadmissible under the opinion rule; and (3) his testimony was highly prejudicial.

[1] Expertise as a basis for an opinion is required only when the inferences to be drawn from given facts demand knowledge not generally possessed by the average layman. See McCormick on Evidence, § 13 (1972). The nature of the hole or crease made by a bullet hitting a wall is indicative of the direction from which a bullet was fired. We agree with the district judge that 'a layman, under certain circumstances can look at a bullet hole in a wall and see whether it appears to come from one direction or another'. No special expertise is required.

Under the so-called opinion rule, the testimony of a lay witness is generally confined to 'statements of concrete facts within his own observation, knowledge and recollection, that is, to facts perceived by the use of his own senses as distinguished from his opinions, inferences, impressions or conclusions drawn from such facts'. Zimberg v. United States, 142 F.2d 132, 135 (1 Cir. 1944), cert. denied, 323 U.S. 712, 65 S.Ct. 38, 89 L.Ed. 573 (1944). This rule, however, is not strictly followed-- due in large part to the difficulty of drawing a fine distinction between fact and opinion. As McCormick suggests, the basis of the opinion rule-- that fact and opinion are distinguishable-- is an 'illusion'. McCormick, supra at § 11. 'There is no conceivable statement however specific, detailed and 'factual,' that is not in some measure the product of inference and reflection as well as observation and memory . . .. The difference between so-called 'fact,' then, and 'opinion' is not a difference between opposites or contrasting absolutes, but a mere difference in degree with no recognizable line to mark the boundary.' Id. See also Central R. Co. of New Jersey v. Monahan, 11 F.2d 212, 214 (2 Cir. 1926).

[2] Given this thin line between fact and opinion, the trial judge should have broad discretion in deciding whether or not to permit opinion testimony. Only a clear abuse of discretion will justify reversing the trial court's admission of opinion evidence. Unitec Corp. v. Beatty Safeway Scaffold Co. of Oregon, 358 F.2d 470, 477-478 (9 Cir. 1966). As Judge Hand commented in Central R. Co. of New Jersey v. Monahan, supra, 'It is hardly ever reversible error to admit such evidence; its foundation may generally be as conveniently left to cross-examination.' 11 F.2d at 214.

[3] We find no abuse of discretion on the part of the trial judge. In giving *177 **86 his opinion, Officer Money was merely relating impressions resulting from his observation of the hole in the wall. By indicating the direction from which he thought the bullet was fired, he probably gave the jurors a clearer conception of the nature of the bullet hole than had he attempted to describe the features of the hole. Having observed the bullet hole itself, he would be better qualified than the jury to draw a conclusion regarding the direction from which the bullet was fired.

[4] We conclude also that Money's testimony was not prejudicial. There was substantial evidence that two guns of different caliber had been fired-- Williams' .38 caliber revolver and a .32 caliber automatic. Counsel for appellant developed on cross-examination that Money could not tell, and he did not think anyone could tell, what caliber slug had made the bullet hole in the wall. Had the jurors accepted appellant's version of his encounter with Williams, they could have concluded that the bullet hole was made by Williams' gun. [FN13]

> FN13. Moreover, although counsel for appellant objected to Money's opinion testimony, he elicited on cross-examination

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

503 F.2d 173                                                                                           Page 5
503 F.2d 173, 164 U.S.App.D.C. 82
(Cite as: 503 F.2d 173, 164 U.S.App.D.C. 82)

>   Money's lay opinion that the bullet which entered the filing cabinet was fired from 'outside the counter area'.

Viewing the evidence as a whole, Money's opinion testimony after cross-examination was of very little probative value. [FN14] Excluding his testimony, there was substantial evidence to justify the jury verdict. Assuming arguendo that Money's testimony was inadmissible, we conclude that its admission was not prejudicial and that the judgment of conviction should be affirmed. See Rhynard v. Filori, 315 F.2d 176, 178-179 (8 Cir. 1963).

>   FN14. Counsel for the Government, in reviewing the Government's case at the beginning of his opening jury argument referred briefly to Money's testimony as tending to show that the bullet hole was not in the line of Williams' firing. The effect of Money's testimony was not otherwise argued by counsel for either party.

Affirmed.

503 F.2d 173, 164 U.S.App.D.C. 82

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit F

Westlaw.

211 F.3d 1266 (Table) Page 1
211 F.3d 1266 (Table), 2000 WL 376155 (4th Cir.(Va.))
**Unpublished Disposition**
(Cite as: 211 F.3d 1266, 2000 WL 376155 (4th Cir.(Va.)))

**H**
**Briefs and Other Related Documents**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Dean Anthony BECKFORD, a/k/a Smiles, a/k/a
Smiley, a/k/a Daniel Davis, a/k/a
Milo, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Claude Gerald DENNIS, a/k/a Jerry Lubin, a/k/a
Jerry, a/k/a G-Man, Defendant-
Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Leonel Romeo CAZACO, a/k/a Jimmy Fingers,
a/k/a Frank Nisbett, a/k/a James
Romeo Nelson, a/k/a Phil, a/k/a Scott,
Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Richard Anthony THOMAS, a/k/a Spooky, a/k/a
Richie, a/k/a Mark Andrew Taylor,
Defendant-Appellant.

Nos. 97-4924, 97-4925, 97-4926, 97-4927.

Argued Jan. 28, 2000.
Corrected Opinion Filed April 28, 2000.
Decided May 3, 2000.

Appeals from the United States District Court for the Eastern District of Virginia, at Richmond. Robert E. Payne, District Judge. (CR-96-66).

John Cadwallader Jones, Jr., Providence Forge, VA; Amy Milton Curtis, Bowen, Bryant, Champlin & Carr, Richmond, VA; Richard Dwight Biggs, Law Office of Marcia G. Shein, P.C., Atlanta, GA, for appellants.

David John Novak, Assistant United States Attorney, Richmond, VA, for appellee.

ON BRIEF: Marcia Gail Shein, Law Office of Marcia G. Shein, P.C., Atlanta, GA, for appellant Beckford; Joseph W. Kaestner, Kaestner & Pitney, P.C., Richmond, VA, for appellant Thomas. Helen F. Fahey, United States Attorney, Stephen W. Miller , Assistant United States Attorney, James B. Comey, Assistant United States Attorney, Richmond, VA, for appellee.

Before WILKINSON, Chief Judge, and MICHAEL and TRAXLER, Circuit Judges.

OPINION

PER CURIAM.

**1 Dean Anthony Beckford ("Beckford"), Claude Gerald Dennis ("Dennis"), Leonel Romeo Cazaco ("Cazaco"), and Richard Anthony Thomas ("Thomas") appeal from their convictions on various drug-related charges, including convictions for murders committed in connection with their drug activities. We affirm.

I.

The record reveals the following facts. Appellants, along with approximately twenty other individuals, were named in a multi-count indictment arising out of their association with a violent "crack" distribution organization known as the "Poison Clan." The organization originated in 1987 in Brooklyn, New York. Beginning in the fall of 1988,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

211 F.3d 1266 (Table)                                                                                                                  Page 2
211 F.3d 1266 (Table), 2000 WL 376155 (4th Cir.(Va.))
**Unpublished Disposition**
**(Cite as: 211 F.3d 1266, 2000 WL 376155 (4th Cir.(Va.)))**

however, the drug operations were expanded along the East Coast and, in particular, migrated into the Richmond, Virginia area.

In connection with their crack distribution activities, the Richmond members of the organization, including appellants, engaged in various threats and acts of violence. Of particular relevance to this appeal are four incidents: the "Tifton Court" murders, the Tracy Lavache shooting, the "Sugar Bottom" murders, and the Bellemeade robbery.

A. *The Tifton Court Murders*

According to the evidence, the Richmond drug operation was originally set up at a Bowe Street apartment by Dean Beckford, Oliver Wiltshire, Delroy Smith, Sherman Ambrose, Dasmond Miller, Andy O'Brien, and Terry Johnson. Wiltshire and Ambrose were primarily responsible for transporting the drugs from New York to Richmond. Beckford, who was the source of the drugs, cooked powder cocaine into crack. Other members, primarily Ambrose and Johnson, sold the crack from the Bowe Street location. Smith's role was to collect the money from Bowe Street and make sure that enough drugs were on-hand at the location. The money collected was turned over to Beckford, who paid the New York suppliers and generally ran the operation.

After the Bowe Street apartment was set up, an additional apartment at Tifton Court was rented to serve as a safe house for Beckford, Smith, Miller, and Wiltshire. Ambrose and Johnson, described as "workers," continued to live in and sell drugs from the Bowe Street apartment. At trial, Smith confirmed that he traveled with Beckford and Miller to Richmond in August 1988 to set up the Bowe Street apartment, and that members returned in September to begin selling drugs from this spot. Smith also confirmed that Beckford was the source of the drugs, manufactured the crack, and took care of the financial aspects of the business, and that the Tifton Court apartment was rented in October 1988 as a safe house for Beckford, Smith, Miller, and Wiltshire.

The murders at Tifton Court took place on December 3, 1988, during the early months of the Poison Clan's Richmond operation. By November 1988, Miller had become dissatisfied with the amount of money he was receiving for his efforts in the drug operation. Beckford's attempts to placate Miller led to arguments and eventually Miller, Ambrose, and Smith began making plans to leave Beckford's organization. Beckford, however, began to suspect the others' plans to strike out on their own and, at about the same time, brought his associate Claude Dennis to Richmond.

**\*\*2** On December 3, Beckford and Dennis went to the Bowe Street apartment to find Ambrose and Miller. Unable to find them, Beckford and Dennis returned to the Tifton Court apartment to wait. Wiltshire was home at the time. As it turns out, Ambrose, Miller, and Smith had been checking out locations in Norfolk to start their own drug distribution spot. Smith's girlfriend, Sarajoni Clayton, was with Smith, Miller, and Ambrose that evening. She confirmed that Smith and Miller were planning to leave Beckford's group and that the trip to Norfolk that evening was to look for a new place to sell drugs. Ambrose also planned to leave the Richmond operation, although there was some testimony that he, unlike Miller and Smith, may have planned to return to New York and leave the business altogether.

In any event, when Smith, Miller, and Ambrose returned to Tifton Court later that night, Ambrose went into the kitchen to call his girlfriend in New York, and Wiltshire went upstairs where he joined Clayton. Beckford, who was still in the living room, demanded that Miller explain where the three men had been. This time, however, the ensuing argument between Beckford and Miller escalated into the shootings of Smith, Miller, and Ambrose.

According to the testimony, Beckford took Miller's .32 caliber Derringer handgun during the argument and refused to give it back to Miller. When the two began scuffling, Smith tried to break them up, but Dennis pointed a .38 caliber handgun at Smith's head. At that point, Beckford nodded to Dennis and went into the kitchen where Ambrose had gone to call his girlfriend. Dennis then shot Miller in the chest, turned, and shot Smith in the chest. Smith played dead for a time, but managed to retrieve his

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

211 F.3d 1266 (Table) Page 3
211 F.3d 1266 (Table), 2000 WL 376155 (4th Cir.(Va.))
**Unpublished Disposition**
(Cite as: 211 F.3d 1266, 2000 WL 376155 (4th Cir.(Va.)))

9mm Smith & Wesson handgun from the back of his pants and get up on his knees. When Smith looked out the front door, he saw Dennis, Beckford, and Wiltshire. Dennis, however, saw that Smith was alive and the two men began to exchange gunfire until Smith shot Dennis on the staircase, where Dennis dropped the .38 caliber handgun. Dennis then ran upstairs, where he encountered Wiltshire and Clayton, and began to crawl out of the upstairs window. Wiltshire ran down the stairs and out of the apartment, where he saw Beckford and Dennis leaving in Beckford's car. Smith also left the apartment and headed towards a nearby convenience store, dropping his 9mm handgun along the way.

In response to calls about the shootings at Tifton Court and of a shooting victim at a nearby convenience store, police officers were dispatched to the area. Upon their arrival, they found Miller lying dead in the living room and Ambrose lying dead in the kitchen. Miller had been shot once in the chest with the .38 caliber revolver and Ambrose had been shot twice with the .32 caliber Derringer, once in the chest and once in the back. The third victim, Smith, was found alive at the convenience store and transported to the hospital. The .38 caliber revolver was found on the steps in the Tifton Court apartment and the .32 caliber Derringer was found in the front yard. Six 9mm shell casings were also recovered.

**\*\*3** An ATF report identified a 9mm Smith & Wesson pistol that had been purchased by Delroy Smith of Tifton Court in November 1988, and an expert in firearm ballistics testified that this pistol could have fired the 9mm bullets found at the crime scene. Another ATF report identified a .32 caliber Derringer pistol that had been purchased by Dasmond Miller, also in November 1988. In a safe in the upstairs bedroom, officers found a tupperware container of clear plastic bags containing crack cocaine and an envelope containing powder cocaine. Several days later, police located an additional hidden compartment at the bottom of the safe which contained $1,000 in currency.

After the Tifton Court shootings, Beckford returned to New York. According to the testimony of Poison Clan member Winston Gordon, Beckford admitted that he shot Ambrose and said that Dennis shot Miller. Similarly, Dennis told Andrew O'Brien that he shot Smith and Miller and that Beckford shot Ambrose.

B. *The Tracy Lavache Shooting*

In early 1989, Poison Clan member Tracy Lavache also transferred from the New York operation to the Richmond operation and began selling drugs at a Rose Avenue distribution spot. By October, however, Lavache began talking to Beckford about leaving the organization and going out on his own. On the evening of October 9, 1989, Beckford led Lavache into an alley behind the distribution spot to "talk." Instead, Beckford shot Lavache twice, once in the arm and once in the chest, attracting the attention of Dennis, Heston Benjamin, and James Phillips to the alley. Dennis and Benjamin put Lavache in the trunk of Beckford's automobile and they, along with Beckford, dumped Lavache's body in a wooded location. Although left for dead, Lavache managed to drag himself to a highway and lived to name his assailants.

C. *The Sugar Bottom Murders*

In 1993, Dean Beckford sent his brother Devon Beckford to Richmond to handle the crack distribution business there. Collin Joseph, whom Dean Beckford had earlier sent to Richmond to sell crack, eventually began to operate as Devon Beckford's right-hand man. Closely associated with these men were Peter Paul, appellant Richard Thomas and appellant Leonel Cazaco. Thomas had also been sent to Richmond to sell drugs there for the Poison Clan, and was eventually supplied drugs by Peter Paul and Cazaco. By 1993, Joseph, Paul, Cazaco, and Thomas were all distributing crack for Devon Beckford from the Bellemeade Apartments in Richmond.

On January 12, 1994, Anthony Baylor, his nephew Marco Baylor, and Anthony Merrit were shot and killed in the Sugar Bottom area of Richmond. A fourth victim, Charles Meekins, was also shot and severely wounded. Collin Joseph provided testimony concerning the drug operation at the time and the Sugar Bottom murders. Specifically, Joseph

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

211 F.3d 1266 (Table)
211 F.3d 1266 (Table), 2000 WL 376155 (4th Cir.(Va.))
**Unpublished Disposition**
(Cite as: 211 F.3d 1266, 2000 WL 376155 (4th Cir.(Va.)))

Page 4

testified that, during a trip to New York shortly before the Sugar Bottom murders, Dean and Devon Beckford discussed expanding the Richmond operation into the Sugar Bottom area of Richmond. Anthony Baylor sold marijuana from an apartment in Sugar Bottom, a place frequented by Thomas, Cazaco, and the others, and Devon Beckford wanted to sell crack cocaine at the same spot. When Baylor refused Devon Beckford's invitation to sell crack for the Beckford organization, Devon Beckford and his associates hatched a plan to rob Baylor and take over the spot. On January 12, they set the plan in motion. Peter Paul drove Joseph, Cazaco, and Thomas to Baylor's Sugar Bottom apartment. Anthony Merritt answered the door and Joseph and Cazaco entered the apartment. Cazaco put a gun to Anthony Baylor's head and demanded money and "weed," and Joseph locked the door. Anthony Baylor and Marco Baylor were seated. Charles Meekins was asleep on the couch. At that point, Thomas knocked on the door and Joseph let him in. Joseph gave his .41 caliber revolver to Thomas, began searching the apartment, and took marijuana, guns, cash, and jewelry. Joseph testified that he then tried to get Cazaco and Thomas to leave, but they started shooting. Thomas fired a shot at Anthony Baylor, and Cazaco turned and shot Merritt in the head. Joseph left, hearing more gunshots on the way out. Cazaco and Thomas followed with the .41 caliber revolver and a pump shotgun taken from the apartment. The four men then returned to Devon Beckford's apartment, where Cazaco reported that "everybody [sic] dead." According to the medical examiner, Marco Baylor had seven gunshot wounds, Anthony Baylor had three gunshot wounds, and Anthony Merritt had two gunshot wounds. Meekins had been shot three times, but survived.

D. *The Bellemeade Robbery*

**\*\*4** Christopher Harris and Corry Woody also sold crack for the Poison Clan in the Bellemeade area of Richmond. In April 1994, Jose Hinton contacted Harris and arranged to meet him to pick up crack cocaine. Harris and Woody, however, planned to rob Hinton instead, and enlisted the aid of Cazaco and Thomas. Unfortunately, the robbery attempt went awry and Walter Twitty, who was not involved in the robbery attempt or the drug trade, was shot three times in the back and killed. Although ultimately convicted of participating in the conspiracy to rob Hinton and of various gun charges in connection with the incident, Cazaco and Thomas were acquitted of the murder charge associated with this incident.

E. *Convictions*

After a joint trial, Beckford, Dennis, Cazaco, and Thomas were each convicted of a substantive violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), *see* 18 U.S.C.A. § 1962(c) (West 1984), and of conspiracy to distribute "crack" and powder cocaine, *see* 21 U.S.C.A. § 846 (West 1999). In addition, Beckford was convicted of engaging in a Continuing Criminal Enterprise ("CCE"), *see* 21 U.S.C.A. § 848 (West 1999), and Beckford and Dennis were each convicted of two counts of committing murder in furtherance of a CCE for the murders of Sherman Ambrose and Dasmond Miller at Tifton Court, *see* 21 U.S.C.A. § 848(e) (West 1999).

In addition to their RICO and conspiracy convictions, Thomas and Cazaco were each convicted of three counts of committing murder in furtherance of a CCE, *see* 21 U.S.C.A. § 848(e), one count of conspiracy to murder in aid of racketeering activity, *see* 18 U.S .C.A. § 1959(a)(5) (West Supp.1999), and three counts of murder in aid of racketeering activity, *see* 18 U.S.C.A. § 1959(a)(1) (West Supp.1999), in connection with the murders of Anthony Baylor, Marco Baylor, and Anthony Merrit at Sugar Bottom; one count of assault with a dangerous weapon in aid of racketeering activity, *see* 18 U.S.C.A. § 1959(a)(3) (West Supp.1999), in connection with the shooting of Charles Meekins at Sugar Bottom; and one count of using and carrying a firearm during a violent crime, *see* 18 U.S.C.A. § 924(c) (West Supp.1999), in connection with the Sugar Bottom incident. Thomas and Cazaco were also convicted of one count of conspiracy to interfere with commerce by robbery, *see* 18 U.S.C.A. § 1951(a) (West Supp.1999), in connection with the Bellemeade robbery of Jose Hinton. Finally, Cazaco and Thomas were each convicted of three firearm offenses connected with the Sugar Bottom and Bellemeade incidents, and Thomas was convicted

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

211 F.3d 1266 (Table)  
211 F.3d 1266 (Table), 2000 WL 376155 (4th Cir.(Va.))  
**Unpublished Disposition**  
**(Cite as: 211 F.3d 1266, 2000 WL 376155 (4th Cir.(Va.)))**

Page 5

of two additional offenses arising from a November 19, 1993 assault with a deadly weapon upon Maurice Robinson.

Although timely sought by the government, the jury declined to impose the death sentence for the murder convictions, and all appellants received sentences of life imprisonment. They appeal their convictions on numerous grounds. For the reasons enunciated below, we find no reversible error and affirm.

II.

**\*\*5** We first address appellants' challenge to the district court's refusal to continue the trial for 30 days due to pretrial publicity. We review the district court's decision for abuse of discretion. *See United States v. Bailey,* 112 F.3d 758, 770 (4th Cir.1997).

The adverse publicity primarily concerns a newspaper article which appeared in *The Richmond Times-Dispatch* on the morning that jury selection was to begin. Entitled "Just Business: Everybody Dead," the article referred to the appellants as members of the Poison Clan and referenced the willingness of members to kill their own and others. [FN1] The contents of the article were gleaned from the prior testimony of two witnesses who were scheduled to appear and testify at trial.

> FN1. The "Poison Clan" name apparently originated from a karate movie, entitled "The Five Deadly Venoms," in which the members of a fictional martial arts organization habitually kill their own members.

Apparently, one juror brought the article into the jury assembly room and there was some discussion among the potential jurors as to whether it was referring to the case for which they were present. Concerned that the article might have influenced the jury pool, the defense requested a 30-day continuance of the trial. The trial court, although agreeing with the government's assertion that there was a legitimate question as to whether the article was substantially prejudicial in the first instance, nevertheless conducted voir dire to assure that neither the article, nor broadcast media reports of it, actually biased the potential jurors.

On the second day of voir dire, the substance of the article was discussed and commented upon to a degree by a member of the jury pool in the presence of other potential jurors. When brought to the attention of the district court, the court again inquired into the matter and, in an abundance of caution, excused every potential juror who had participated in or overheard the comments--virtually the entire panel. The remaining days of voir dire were handled in a similar manner. Those who had read the article or heard a broadcast media report of it were allowed to remain on the panel, but only if the district court was assured through questioning that each juror could ignore the information contained in the publicity and give each defendant a fair and impartial trial.

The court applies a two-step analysis to claims that a jury was so tainted by potentially prejudicial publicity as to deprive a defendant of a fair and impartial trial. First, the court must determine "whether the publicity is so inherently prejudicial that trial proceedings must be presumed to be tainted." *United States v. Bakker,* 925 F.2d 728, 732 (4th Cir.1991). Prejudice from pretrial publicity, however, will be presumed " '[o]nly in extreme circumstances.' " *Id.* (quoting *Wells v. Murray,* 831 F.2d 468, 472 (4th Cir.1987)).

When prejudice may not be presumed, the district court is to "take the second step of conducting a voir dire of prospective jurors to determine if actual prejudice exists." *Id.; see also Bailey,* 112 F.3d at 769. "Save in that rare case where there is a showing of 'inherently prejudicial publicity which has so saturated the community, as to have a probable impact upon the prospective jurors[,]' ... the trial court's primary responsibility in dealing with allegedly prejudicial pre-trial publicity--whether in connection with a motion for continuance or for a change of venue--is [to determine] whether, as a result of such publicity, it is reasonably unlikely that the defendant can secure a fair and impartial trial." *United States v. Jones,* 542 F.2d 186, 193 (4th Cir.1976) (footnote omitted). "[T]rial courts must be vigilant to ensure that jurors are not biased and trials are not compromised by media attention surrounding a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

211 F.3d 1266 (Table)  
211 F.3d 1266 (Table), 2000 WL 376155 (4th Cir.(Va.))  
**Unpublished Disposition**  
(Cite as: 211 F.3d 1266, 2000 WL 376155 (4th Cir.(Va.)))

Page 6

case." *Bakker,* 925 F.2d at 734. However, " 'it is not required ... that jurors be totally ignorant of the facts and issues involved.... It is sufficient if the juror can lay aside his impression or opinion, and render a verdict based on the evidence presented in court.' " *Id.* (quoting *Irvin v. Dowd,* 366 U.S. 717, 722-23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)).

**\*6** Appellants assert that the article was inherently or presumptively prejudicial, and that they were entitled to a continuance regardless of the juror responses to the court's voir dire. Alternatively, they assert that the district court's voir dire on the publicity issue was deficient. We disagree. The limited publicity involved here cannot seriously be said to have so saturated the community as to raise a presumption of prejudice. And the appellants themselves level no charge that the information contained in the article was not ultimately presented at trial. Furthermore, setting aside the legitimate question as to whether the article was prejudicial in the first instance, we are satisfied that the district court's voir dire examination of the article's influence upon the jury panel was more than sufficient to ensure that there was no actual prejudice from the pretrial publicity. The court examined all potential jurors concerning their exposure to the publicity, if any, and the effect upon them. Nearly an entire jury panel was excused when the court learned that the article had become a subject of discussion in their jury room. And every other potential juror who expressed any hesitancy about the ability to be fair and impartial was excused. Under the circumstances, we conclude that the district court did not abuse its discretion in denying appellants' motion for a continuance due to pretrial publicity.

III.

A.

Beckford appeals the district court's decision to allow an investigating officer to use a computer-generated diagram of the Ambrose/Miller murder scene at Tifton Court. We review the district court's evidentiary rulings for abuse of discretion. *See United States v. Grimmond,* 137 F.3d 823, 831 (4th Cir.), *cert. denied,* 525 U.S. 850, 119 S.Ct. 124, 142 L.Ed.2d 100 (1998).

As part of the investigation of the Tifton Court murders, one of the investigating detectives inserted a pencil into bullet holes found in the Tifton Court apartment to ascertain the angle of the bullet path. From this and crime scene photographs, the government created a computer-generated diagram which utilized red lines to trace the bullet path suggested by the pencil angle. Over Beckford's objection, the diagram was used as a demonstrative aid to the detective's testimony concerning his lay observations of the bullets, bullet holes, and angles. The exhibit itself, however, was not admitted into evidence. Beckford does not take issue with the diagram's depiction of the location of the bullets, the bullet holes or the angles of the bullet holes. Nor does Beckford claim that the bullet paths depicted on the diagram were inaccurate. Rather, Beckford asserts that depictions of a bullet's trajectory require expert testimony, *see* Fed.R.Evid. 702, and that the officer's demonstrative use of the diagram at trial was unfairly prejudicial, *see* Fed.R.Evid. 403.

After careful consideration, we conclude that the district court was well within its discretion in allowing the detective to utilize the computer-generated diagram to illustrate his investigative findings. Federal Rule of Evidence 701 provides that a lay witness may offer opinion testimony if the "opinions or inferences ... are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." *Id.* In this case, the district court reasonably concluded that the detective's testimony concerning his findings, as aided by the diagram, was rationally based on his perceptions and helpful to a clear understanding of his investigation and observations.

**\*7** Furthermore, even were we to conclude that the district court ran afoul of its broad discretion in allowing the detective to testify utilizing the diagram, the error was harmless. "[I]n order to find a district court's error harmless, we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Heater,* 63 F.3d 311, 325 (4th Cir.1995) (internal quotation marks omitted). Here, the government

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

211 F.3d 1266 (Table)                                                                                    Page 7
211 F.3d 1266 (Table), 2000 WL 376155 (4th Cir.(Va.))
**Unpublished Disposition**
**(Cite as: 211 F.3d 1266, 2000 WL 376155 (4th Cir.(Va.)))**

presented strong evidence of the events on the night of the Tifton Court murders, most notably the testimony of eyewitnesses Delroy Smith and Oliver Wiltshire, and we believe it untenable that the jury's verdict was "substantially swayed" by the detective's testimony regarding bullet paths found at the scene.

B.

Beckford also challenges his conviction for engaging in a continuing criminal enterprise. *See* 21 U.S.C.A. § 848(c). In order to establish a conviction for engaging in a CCE, the government must prove the following five elements:
> (1) defendant committed a felony violation of the federal drug laws; (2) such violation was part of a *continuing series of violations of the drug laws;* (3) the series of violations were undertaken by defendant in concert with five or more persons; (4) defendant served as an organizer or supervisor, or in another management capacity with respect to these other persons; and (5) defendant derived substantial income or resources from the continuing series of violations.

*United States v. Wilson,* 135 F.3d 291, 303 (4th Cir.), *cert. denied,* 523 U.S. 1143, 118 S.Ct. 1852, 140 L.Ed.2d 1101 (1998) (quoting *United States v. Ricks,* 882 F.2d 885, 890-91 (4th Cir.1989)) (emphasis added).

The district court instructed the jury that " 'a continuing series of violations' means three or more violations of the federal narcotics laws which share a single or substantially similar or related purpose." J.A. 1186. The jury, however, was not instructed that it must unanimously agree upon the three specific acts that make up the "continuing series." Nor was such required under the then-existing precedent of this court. *See United States v. Hall,* 93 F.3d 126, 129 (4th Cir.1996) (holding that unanimity with respect to particular violations is not required for a CCE conviction).

In *Richardson v. United States,* 526 U.S. 813, 119 S.Ct. 1707, 1713, 143 L.Ed.2d 985 (1999), however, the Supreme Court held that a jury in a CCE case must unanimously agree that the defendant committed a continuing series of violations and agree upon the specific violations that make up the continuing series. Recently, in *United States v. Brown,* 202 F.3d 691, 699 (4th Cir.2000), we recognized the abrogation of *Hall* by *Richardson.* We further held that a *Richardson* error is not a structural error, but rather is subject to harmless error analysis. *Id.* at 699. "In conducting a harmless error analysis, our task is to determine whether 'the guilty verdict actually rendered [at] trial was surely unattributable to the error.' " *Id.* (quoting *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)). And we noted in *Brown* that a *Richardson* error "may be harmless even if we cannot determine that the jury necessarily found the omitted element." *Id.* at 700. If we" 'conclude[ ] beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.' " *Id.* (quoting *Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 1837, 144 L.Ed.2d 35 (1999)).

**8 Beckford asserts that, pursuant to the change wrought by *Richardson,* the district court's failure to instruct the jury that they must unanimously agree upon the specific acts comprising the continuing series warrants a reversal of his conviction for engaging in a CCE. However, because Beckford did not timely object to the lack of the unanimity instruction at trial, we consider in this case whether the lack of the unanimity instruction constitutes plain error that warrants a reversal or remand. *See* Fed.R.Crim.P. 52(b); *United States v. Olano,* 507 U.S. 725, 731-32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Under the *Olano* plain error standard, Beckford must demonstrate that there is "(1) error; (2) that is plain; and (3) that affect[s] substantial rights." *United States v. David,* 83 F.3d 638, 641 (4th Cir.1996) (alteration in original) (internal quotation marks omitted). If all three prerequisites are met, we may then exercise our discretion to notice the error if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *Olano,* 507 U.S. at 732) (alteration in original) (internal quotation marks omitted).

In light of the Supreme Court's decision in *Richardson,* the district court's failure to give a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

211 F.3d 1266 (Table)  
211 F.3d 1266 (Table), 2000 WL 376155 (4th Cir.(Va.))  
**Unpublished Disposition**  
**(Cite as: 211 F.3d 1266, 2000 WL 376155 (4th Cir.(Va.)))**

Page 8

unanimity instruction was plain error. *See United States v. Hastings,* 134 F.3d 235, 239-40 (4th Cir.1998) (noting that an intervening Supreme Court decision rendered firearm instruction, although consistent with the law of this circuit at the time, plain error). Beckford, however, is not entitled to relief from his CCE conviction because he has failed to show that the error affected his substantial rights, and because the error did not "seriously affect the fairness, integrity or public reputation of judicial proceedings." *Olano,* 507 U.S. at 732 (internal quotation marks omitted).

First, Beckford has failed to show "that the error affected his substantial rights, *i.e.,* that it was prejudicial." *Hastings,* 134 F.3d at 240. "On harmless-error review, a defendant is entitled to reversal of his conviction unless the Government can establish that the error does *not* affect substantial rights." *Id.* (internal quotation marks omitted). However, "on plain-error review, a defendant is entitled to reversal only upon a showing that the error *does* affec[t] substantial rights, that is, that the error actually affected the outcome of the proceedings." *Id.* (internal quotation marks omitted) (alteration in original). Thus, "harmless error and plain error are not the same, and the fact that an error is not harmless does not necessarily mean it affected the defendant's substantial rights." *Id.* (internal quotation marks omitted). And we do not "simply review to determine whether the instructional error was harmless beyond a reasonable doubt." *Id.* at 243. Rather, Beckford's burden of showing that his substantial rights were affected by the error required him to show that the error actually resulted in his conviction. *See id.*

**\*9** Beckford has not satisfied this burden. At trial, Beckford did not contest that he was involved in three or more drug trafficking transactions and the evidence substantiating such involvement was overwhelming. Indeed, Beckford's entire trial strategy was not to claim that he was innocent of dealing drugs in the face of overwhelming evidence to the contrary, but to dispute that he was the "organizer or supervisor, or in another management capacity with respect to the[ ] other persons" involved in the enterprise, *Wilson,* 135 F.3d at 303, and instead paint himself as a mere minion in the organization. [FN2] In view of the overwhelming, and indeed uncontested, evidence of Beckford's drug dealing, we are satisfied that the outcome of Beckford's conviction for engaging in a CCE would have been the same even if the court had instructed the jury that unanimity on three offenses comprising the continuing series was required.

> FN2. For example, Beckford's counsel argued:
> [Beckford]'s selling drugs to Sherman Ambrose. It's a buyer and a seller. It's a wholesaler and a retailer. They are doing their own thing. They are out there selling....
> Tr. 7076.
> Look, we don't dispute the fact that Dean Beckford sold drugs. That's not the question here.... He sold drugs.
> Tr. 7081.
> Dean Beckford is selling drugs for a long time, and they haven't shown by their own chart very much money. We don't have houses. We don't have cars. We don't have boats.... You got a couple of trips. You got some jewelry. It's hardly the expenditures of a kingpin.
> Tr. 7086-87.

Second, even if Beckford could have shown that the error affected his substantial rights, the court would decline to notice the error because it does not "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Hastings,* 134 F.3d at 244 (internal quotation marks omitted). "Central to this inquiry is a determination of whether, based upon the record in its entirety, the proceedings against the accused resulted in a fair and reliable determination of guilt." *Id.* (internal quotation marks omitted). Again, given the overwhelming evidence of Beckford's involvement in drug transactions and his admission of the same, we have no hesitancy in determining that the CCE conviction was a fair and reliable verdict. *See also United States v. Williams,* 152 F.3d 294, 300 (4th Cir.1998) (declining to exercise discretion to notice an erroneous jury instruction where evidence of guilt was overwhelming). Accordingly, Beckford's CCE conviction is affirmed.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

211 F.3d 1266 (Table)  
211 F.3d 1266 (Table), 2000 WL 376155 (4th Cir.(Va.))  
**Unpublished Disposition**  
**(Cite as: 211 F.3d 1266, 2000 WL 376155 (4th Cir.(Va.)))**

Page 9

C.

In addition to the above claims, Beckford contends that the district court erred in allowing the government to use an organization chart. A district court's decision to allow the use of "summary charts 'will not be overturned on appeal unless [the] decision is shown to be arbitrary or irrational.' " *United States v. Loayza,* 107 F.3d 257, 264 (4th Cir.1997) (quoting *United States v. Johnson,* 54 F.3d 1150, 1156 (4th Cir.1995)).

The chart, utilized by the government during its opening and case presentation, consisted of photographs of alleged Poison Clan members which were individually admitted into evidence. It utilized no ranking information, but rather consisted of the photographs with the names and aliases of each person underneath. The government used the chart to identify members of the organization, who were referred to throughout the trial by their various nicknames and aliases. Under the circumstances, we find no abuse of discretion in the district court's decision to allow the government to use the chart.

D.

**\*\*10** Beckford's final assertion on appeal is that the government improperly made remarks during the rebuttal portion of the closing argument which placed a "new twist" or "different angle" on the Tifton Court murders. Appellants' Brief at 84. This contention, which consists of at best a vague and undefined complaint, is patently insufficient to warrant reversal.

IV.

A.

Dennis appeals his convictions for RICO and murder in furtherance of a CCE as violative of the Double Jeopardy Clause of the United States Constitution because the basis for these convictions involved conduct for which he was previously tried by the Commonwealth of Virginia. Because it presents a legal question, we review this claim de novo. *See United States v. Imngren,* 98 F.3d 811, 813 (4th Cir.1996).

The conduct at issue involved the Tifton Court murder of Dasmond Miller and attempted murder of Delroy Smith on December 4, 1988, and the additional shooting incident involving Tracy Lavache. Dennis was prosecuted in the Circuit Court of the City of Richmond in June 1989 for the Tifton Court crimes, but was acquitted. He was prosecuted in June 1990 for his role in assisting Beckford in the shooting of Lavache, and convicted of abduction and accessory after the fact to malicious wounding. Dennis now asserts that we must overturn his convictions under the RICO and CCE statutes because the Tifton Court and Lavache crimes were advanced as racketeering acts for the RICO indictment and because the murder in furtherance of a CCE was based upon the killing of Dasmond Miller.

While the Double Jeopardy Clause of the Fifth Amendment generally protects against successive prosecutions for the same offense, the "dual or separate sovereigns" doctrine normally eliminates the Double Jeopardy bar to a federal prosecution after a state prosecution. *See Heath v. Alabama,* 474 U.S. 82, 89, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) ("[T]he Court has uniformly held that the States are separate sovereigns with respect to the Federal Government because each State's power to prosecute is derived from its own 'inherent sovereignty,' not from the Federal Government."). Dennis agrees, but relies upon the "sham prosecution" exception advanced in *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), to argue his exception from the general rule. In *Bartkus,* the Court rejected a claim that, because federal officials acted in cooperation with state authorities, the state prosecution was used as "merely a tool of the federal authorities" to avoid the Fifth Amendment bar and a "sham and a cover for a federal prosecution." *Id.* at 123-24.

Since *Bartkus,* we have noted that "[a]lthough a 'tool of the same authorities' exception is possible in some circumstances, that exception may only be established by proof that State officials had little or no independent volition in their proceedings." *In re Kunstler,* 914 F.2d 505, 517 (4th Cir.1990) (citation omitted); *see also United States v. Baptista-Rodriguez,* 17 F.3d 1354, 1361 (11th Cir.1994) ("To fit within the [sham prosecution]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

211 F.3d 1266 (Table)                                                                 Page 10
211 F.3d 1266 (Table), 2000 WL 376155 (4th Cir.(Va.))
**Unpublished Disposition**
**(Cite as: 211 F.3d 1266, 2000 WL 376155 (4th Cir.(Va.)))**

exception, the defendant must show that one sovereign was so dominated, controlled, or manipulated by the actions of the other that it did not act of its own volition."). Here, there was no federal involvement in the state prosecutions, much less a federal domination of those prosecutions. Years after the state trials were held, federal and state authorities formed a "Richmond Cold Homicide Task Force" to investigate various unsolved homicides in the City of Richmond. Even Dennis does not go so far as to assert that the federal authorities were dominated by the state sovereign on the task force, but rather seems to invite this court to extend the "sham prosecution" exception to cases in which there is this type of cooperation and interdependence of federal and state authorities. We do not read the exception to the "dual sovereignty" doctrine so broadly. [FN3] Accordingly, we affirm Dennis' RICO and CCE convictions.

> FN3. Other courts, we note, have virtually refused to recognize that *Bartkus,* in the course of rejecting the argument advanced there, intended to create a "sham prosecution" exception in the first place. *See, e.g., United States v. Brocksmith,* 991 F.2d 1363, 1366-67 (7th Cir.1993) ("We have questioned whether *Bartkus* truly meant to create such an exception, and we have uniformly rejected such claims. In any event, conversations and cooperative efforts between state and federal investigators of the kind Brocksmith alleges are undeniably legal and are, in fact, a welcome innovation in law enforcement techniques.") (citations and internal quotation marks omitted).

B.

**11 Dennis also appeals the district court's refusal to admit a property voucher into evidence, a decision that we review for abuse of discretion. *See United States v. Grimmond,* 137 F.3d 823, 831 (4th Cir.), *cert. denied,* 525 U.S. 850, 119 S.Ct. 124, 142 L.Ed.2d 100 (1998); *Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co.,* 951 F.2d 613, 619 (4th Cir.1991).

In the days after the Tifton Court murders, Detective C.T. Woody interviewed Delroy Smith at the hospital where he was taken. Also during Smith's hospitalization, Officer Woody was given some clothing and other items, including .38 caliber bullets, by an unidentified nurse or doctor. Detective Woody listed Smith as the source of the items on the property voucher, but testified that he had no personal knowledge of the source of the clothing or other items given to him that day and that he listed Smith as the source based solely upon the hearsay statement of the unidentified hospital personnel. Woody was also unable to provide the identity of the nurse or doctor, or the basis for that person's knowledge of the source of the items. Smith denied having any .38 caliber bullets in his clothing when he was taken to the hospital.

Dennis sought to introduce the voucher under the business records exception to the hearsay rule, Fed.R.Evid. 803(6), arguing that it contained relevant, exculpatory evidence suggesting that Smith, rather than Dennis, killed Dasmond Miller with a .38 handgun. The district court excluded the voucher, ruling that the business records exception did not apply because the information recorded in the voucher was not recorded by someone with personal knowledge of the facts and, therefore, did not possess the inherent reliability aspects which underlie the business records exception.

We agree. The business records exception to the hearsay rule plainly allows for the admission of "reliable and accurate records," but only upon the valid presumption that the information contained therein is inherently reliable. *See* Fed.R.Evid. 803(6). Also, hearsay within hearsay is admissible only if it also comes within an exception to the hearsay rule. *See* Fed.R.Evid. 805; *Precision Piping,* 951 F.2d at 619; *United States v. Portsmouth Paving Corp.,* 694 F.2d 312, 321 (4th Cir.1982). If it is shown that "the source of information or the method or circumstances of preparation [of a business record] indicate lack of trustworthiness," Fed.R.Evid. 803(6), the record should not be admitted into evidence, *see Timberlake Constr. Co. v. U.S. Fidelity & Guar. Co.,* 71 F.3d 335, 341 (10th Cir.1995).

The determination of whether the proponent of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

211 F.3d 1266 (Table)                                                                                                                              Page 11
211 F.3d 1266 (Table), 2000 WL 376155 (4th Cir.(Va.))
**Unpublished Disposition**
**(Cite as: 211 F.3d 1266, 2000 WL 376155 (4th Cir.(Va.)))**

hearsay evidence has met the requirements of the business records exception and whether the circumstances indicate a lack of trustworthiness is left to the sound discretion of the trial judge. In this case, the circumstances surrounding the property voucher plainly suggested that the information contained within the voucher was not trustworthy because it was based solely upon the hearsay statement of an unidentified person. Because "an essential link in the trustworthiness chain fail[ed]," *id.* at 342, we cannot say that the district court abused its discretion in excluding the property voucher from evidence. [FN4]

> FN4. Dennis also asserted that the evidence was admissible under the public records exception to the hearsay rule, Fed.R.Evid. 803(8). For the same reasons, we reject this contention. *See* Fed.R.Evid. 803(8) (allowing for admission of public records and reports "unless the sources of information or other circumstances indicate lack of trustworthiness").

C.

**\*\*12** Dennis next asserts that, even if the district court properly refused to allow the voucher into evidence under Fed.R.Evid. 803, he is entitled to a new trial because the government's failure to disclose the existence and identity of the individuals who gave Detective Woody the property listed on the voucher was a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Again, we disagree.

Under *Brady,* favorable evidence must be material in order for its nondisclosure to violate due process and result in actual prejudice. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). However, "the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources." *United States v. Wilson,* 901 F.2d 378, 380 (4th Cir.1990) (internal quotation marks omitted); *see Barnes v. Thompson,* 58 F.3d 971, 975 n. 4 (4th Cir.1995) (noting that "*Brady* requires that the government disclose only evidence that is not available to the defense from other sources, either directly or through diligent investigation").

In this case, Dennis was in possession of the voucher in advance of trial and was aware of Detective Woody's involvement in the investigation of the Tifton Court murders, as well as his preparation of the voucher. Although Dennis now claims that the evidence excluded was critical to his defense, there is no indication that Detective Woody was interviewed in advance of trial or that Dennis ever otherwise attempted to verify or ascertain the source of the property listed on the voucher. Under the circumstances, we conclude that Dennis has not established that the government's failure to disclose the existence and identity of the person or persons who gave Detective Woody the property inventoried on the voucher constitutes a *Brady* violation.

V.

A.

Cazaco and Thomas challenge the sufficiency of the evidence to support their convictions for the counts involving the Sugar Bottom murders. "If there is substantial evidence to support the [jury's] verdict, after viewing all of the evidence and the inferences therefrom in the light most favorable to the Government," the court must affirm. *United States v. Murphy,* 35 F.3d 143, 148 (4th Cir.1994). Substantial evidence is evidence that a "reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos,* 94 F.3d 849, 862 (4th Cir.1996) (en banc).

The crux of Cazaco's and Thomas' challenge is that the testimony of co-conspirator Collin Joseph should have been rejected because there were some discrepancies in his testimony and he had been given immunity from further charges. However, it is well-established that, when reviewing sufficiency of the evidence claims, "we must remain cognizant of the fact that '[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

211 F.3d 1266 (Table)                                                               Page 12
211 F.3d 1266 (Table), 2000 WL 376155 (4th Cir.(Va.))
**Unpublished Disposition**
**(Cite as: 211 F.3d 1266, 2000 WL 376155 (4th Cir.(Va.)))**

any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe.' " *Id.* at 862 (alteration in original) (quoting *Murphy,* 35 F.3d at 148).

**13 Furthermore, while "[t]he settled law of this circuit recognizes that the testimony of a defendant's accomplices, standing alone and uncorroborated, can provide an adequate basis for conviction," *United States v. Burns,* 990 F.2d 1426, 1439 (4th Cir.1993), Joseph's testimony did not stand alone. It was corroborated at trial by both forensic evidence and the testimony of various other witnesses connecting Cazaco and Thomas to the spoils of the robbery and to the murders. Accordingly, we conclude that the government presented sufficient evidence to support the convictions obtained against Cazaco and Thomas for their participation in the Sugar Bottom murders.

B.

Cazaco asserts that the district court erred in denying his motion to quash the death penalty notice or for a continuance because the government failed to inform him upon his arrest that he had the right to contact the French Consulate, as required by the Vienna Convention on Consular Relations, Apr. 24, 1963, art. 36, 21 U.S.T. 77, 101. The Vienna Convention requires an arresting government to inform a foreign national who has been arrested of his right to contact his consul. *See id.*

Assuming, without deciding, that Cazaco has standing to raise this issue, [FN5] we conclude that he is not entitled to relief. The government concedes that the Convention requires such notification and that Cazaco was not informed of this right. However, rights created by international treaties do not create rights equivalent to constitutional rights. *Cf. Murphy v. Netherland,* 116 F.3d 97, 100 (4th Cir.1997) (habeas corpus proceeding). Therefore, Cazaco must establish prejudice to prevail. *Cf. Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998) (habeas corpus proceeding); *United States v. Ademaj,* 170 F.3d 58, 67 (1st Cir.), *cert. denied,* 528 U.S. 887, 120 S.Ct. 206, 145 L.Ed.2d 173 (1999) (harmless error); *Waldron v. INS,* 17 F.3d 511, 518-19 (2d Cir.1993) (deportation proceedings).

> FN5. *See Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998) (stating that "[t]he Vienna Convention ... arguably confers on an individual the right to consular assistance following arrest."); *United States v. Lombera-Camorlinga,* No. 98-50347, 2000 WL 245374, at *2-3 (9th Cir. Mar.6, 2000) (en banc) (declining to decide whether the Vienna Convention creates individually enforceable rights in the first instance).

On appeal, Cazaco admits that he was made aware of his rights under the Vienna Convention by his trial counsel. He asserts, however, that this does not affect the government's responsibility to also advise him of his rights and that, as a result of the government's failure to do so, he was entitled to either an order quashing the death penalty notice or an order continuing the trial to allow the defense time to seek and receive the assistance of the French consulate. Cazaco, however, was not sentenced to death and he has not demonstrated how the failure would have otherwise affected the outcome of his case. Accordingly, we conclude that the district court did not err in rejecting his claim.

C.

In addition to the above claims, Cazaco argues that the district court erred in denying his motion to sever the trial, that the district court erred in denying his motion to dismiss the indictment based upon a prior plea agreement and the Double Jeopardy Clause, that there was insufficient evidence to support the charges stemming from the Bellemeade robbery, and that the government failed to prove proper venue and jurisdiction. Also, Thomas argues that the government failed to sufficiently prove that he knowingly joined a racketeering enterprise. We have carefully considered these additional challenges to the convictions and conclude that none are of sufficient merit to warrant reversal.

VI.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

211 F.3d 1266 (Table)  
211 F.3d 1266 (Table), 2000 WL 376155 (4th Cir.(Va.))  
**Unpublished Disposition**  
**(Cite as: 211 F.3d 1266, 2000 WL 376155 (4th Cir.(Va.)))**

Page 13

**\*\*14** For the foregoing reasons, the convictions of Dean Anthony Beckford, Claude Gerald Dennis, Leonel Romeo Cazaco, and Richard Anthony Thomas are affirmed in their entirety.

*AFFIRMED.*

211 F.3d 1266 (Table), 2000 WL 376155 (4th Cir.(Va.)), Unpublished Disposition

**Briefs and Other Related Documents (Back to top)**

- 97-4927 (Docket)  
  (Nov. 28, 1997)

- 97-4926 (Docket)  
  (Nov. 26, 1997)

- 97-4925 (Docket)  
  (Nov. 26, 1997)

- 97-4924 (Docket)  
  (Nov. 26, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.