| | CITY OF BRIDGEPORT | |
|---|---|---|
| CITY ATTORNEY<br>Mark T. Anastasi | OFFICE OF THE CITY ATTORNEY | ASSISTANT CITY ATTORNEYS |
| | 999 Broad Street<br>Bridgeport, Connecticut 06604-4328 | Christine Donahue Brown<br>Gregory M. Conte |
| DEPUTY CITY ATTORNEY<br>Salvatore C. DePiano | | Arthur C. Laske III<br>R. Christopher Meyer<br>Stephen J. Sedensky, Jr. |
| ASSOCIATE CITY ATTORNEYS<br>John H. Barton<br>Melanie J. Howlett<br>Russell D. Liskov<br>Barbara Brazzel-Massaro<br>John R. Mitola<br>Ronald J. Pacacha<br>Lisa R. Trachtenburg |  | LEGAL ADMINISTRATOR<br>Kathleen Pacacha<br><br>Telephone (203) 576-7647<br>Facsimile (203) 576-8252 |

November 30, 2004

Attorney Kenneth Heath
Wiggin and Dana
One Century Tower
New Haven, Connecticut

RE: Richardson v. Miranda, et al.

Dear Attorney Heath:

    I have just received the Notice of Deposition and Subpoena back from New Jersey with a notation that 4 attempts were made to serve the subpoena to Mr. Sancho and they were not successful. These attempts were made after I sent an investigator to the address in an attempt to serve Mr. Sancho and he was also unsuccessful. Therefore, the deposition scheduled for Friday, December 3, 2004 will not go forward.

    As you already know from our telephone conversation, my investigator called Mr. Sancho after receiving the information of the whereabouts of Mr. Sancho from you on November 8, 2004. Mr. Sancho informed my investigator that on the advise of his counsel he would not talk to him but that he planned on testifying. With that said, Mr. Sancho hung up the telephone and we were unable to discuss anything with him regarding the case. Based upon his statements we have attempted to subpoena him but apparently he is intent upon not talking to the defendants counsel. Given the nature of his response and the inability to conduct a deposition of Mr. Sancho, the defendants have no other choice at this time except to submit to the court a Motion in Limine concerning his testimony.

    I have also spoken to Dr. Ostroff regarding the action and he is available for trial in this matter. Dr. Ostroff also indicated again that further testing of you client should be done. To date, you have not permitted such. I would like to have you explain your rationale for not permitting the testing Dr. Ostroff has recommended. I would also like to



have you reconsider allowing the defendants to complete the expert analysis that Dr. Ostroff believes necessary. Let me know your position.

Very truly yours,

Barbara Brazzel-Massaro

CITY ATTORNEY
Mark T. Anastasi

DEPUTY CITY ATTORNEY
Salvatore C. DePiano

ASSOCIATE CITY ATTORNEYS
John H. Barton
Melanie J. Howlett
Russell D. Liskov
Barbara Brazzel-Massaro
John R. Mitola
Ronald J. Pacacha
Lisa R. Trachtenburg

CITY OF BRIDGEPORT
OFFICE OF THE CITY ATTORNEY
999 Broad Street
Bridgeport, Connecticut 06604-4328



ASSISTANT CITY ATTORNEYS

Christine Donahue Brown
Gregory M. Conte
Arthur C. Laske III
R. Christopher Meyer
Stephen J. Sedensky, Jr.

LEGAL ADMINISTRATOR
Kathleen Pacacha

Telephone (203) 576-7647
Facsimile (203) 576-8252

December 20, 2004

Kenneth D. Heath, Esq.
Wiggin and Dana
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832

Re: **RICHARDSON v. MIRANDA, ET AL**

Dear Attorney Heath:

I am in receipt of your December 14, 2004 letter. I would like to clarify some items that you addressed.

First of all, no one is stating that you suggested to Mr. Sancho that he evade service of a subpoena. However, if my memory is correct, in our telephone conversation about Mr. Sancho you clearly indicated that you spoke with him for about an hour and received information from him. Our office has not been afforded the same opportunity. As I indicated, Mr. Sancho refused to talk to my investigator and, in fact, hung the phone up on him. The Defendants certainly believe that they are entitled to take his deposition before trial. The difficulty has been that we did not have access to his address until recently. Now, Mr. Sancho is out of state and our attempts to subpoena him were also unsuccessful. In light of this difficulty, the Defendants are prejudiced in their defense and presentation of their case. Because of the delay in locating, and now his refusal, we will seek a Motion in Limine to preclude his testimony. As to the remaining individuals who were also disclosed late with no information to locate them, we will file a motion to preclude their testimony.



-2-

As to Dr. Ostroff, he has met and performed some testing. His opinion letter speaks to the findings. However, Dr. Ostroff noted that a number of tests which are ordinarily done to assess PTSD were not performed by any professional. I had scheduled Dr. Pioli to perform these tests and make them available to Dr. Johnson as well as Dr. Ostroff. It is our position that without administering the tests there may still be open questions. If you are willing, I will re-schedule the tests immediately so that the final reports will be available in early January. I have sent the dates you proposed to Dr. Ostroff.

Very truly yours,

*Barbara B. Massaro*

Barbara Brazzel-Massaro
Associate City Attorney

BBM/ch201

cc:   Dan Kalish, Esq.

# PIOLI PSYCHOLOGICAL SERVICES

1495 Black Rock Turnpike • Fairfield, CT 06432 • (203) 366-3570

John J. Pioli, Ph.D.  
Licensed Psychologist

Liane M. Pioli, Ph.D.  
Licensed Psychologist

**Client's Name:** Brian Richardson  
**Age:** 29 years  
**Date of Birth:** 02/12/1975  
**Education:** High School  
**Exam Date:** 01/14/2005  
**Examiner:** Liane M. Pioli, Ph.D.  
**Referred By:** Office of the City Attorney, City of Bridgeport

## TESTS ADMINISTERED:

WAIS-III:    Verbal IQ: 75      Performance IQ: 73      Full Scale IQ: 72

| | | | |
|---|---|---|---|
| Vocabulary | 9 | Picture Completion | 2 |
| Similarities | 4 | Digit Symbol/Coding | 4 |
| Arithmetic | 2 | Block Design | 6 |
| Digit Span | 3 | Matrix Reasoning | 7 |
| Information | 8 | Picture Arrangement | 9 |
| Comprehension | 9 | | |

Verbal Comprehension: 84
- Vocabulary ............9
- Similarities ............4
- Information ........... 8

Perceptual Organization: 70
- Picture Completion... 2
- Block Design ..........6
- Matrix Reasoning......7

MMPI-2 - see attached profile

Clinical Interview

Review of Court and School Records

## REASON FOR REFERRAL:

Brian Richardson is a 29 year old, African-American male who is currently serving a sentence at Osborn Correctional Facility in Somers CT. This evaluation was requested to determine whether Mr. Richardson is malingering or distorting his physical and mental symptoms in order to gain monetary rewards in a law suit against the City of Bridgeport. Mr. Richardson was tested at the Osborn Correctional Facility in a private, quiet room off the visiting area. Test instruments utilized include the WAIS-III and the MMPI-2. These instruments are highly respected in the field of psychological testing as they have a high degree of validity and supportive statistical properties. The above instruments represent the most currently normed versions of the tests.

## CLINICAL INTERVIEW, MENTAL STATUS, OBSERVATIONS & TEST BEHAVIOR:

Brian Richardson is a 29 year old, single, African-American father of two male children. A more complete history may be found in other areas of his clinical records. The only data presented here will be clinically relevant material that was introduced during testing. Mr. Richardson was very cooperative with the examiner and he seemed to have a great interest in demonstrating his problems. He was at all times very polite, alert, and attentive.

When approached for testing, Mr. Richardson was sitting slightly slumped over in a chair. He appeared to be depressed, apathetic, tired, and anhedonic. Mr. Richardson was rubbing his left eye and initially spoke to the examiner with his eyes half closed, stating that he suffered from terrible headaches and a spasm of the muscles in his left temporal and eye area. It was noted that Mr. Richardson's right hand was limp and during the exam he used his thumb and index finger (he is right handed). He showed the examiner a scar on his right palm. There was no indication in his medical record that he suffered any nerve damage to his right hand that would account for the lack of use in three fingers. Analysis of motor control on the Coding subtest of the WAIS-III indicated good motor control, which would be difficult to do with only two fingers. In addition, the examiner reviewed a hand-written account of his arrest that Mr. Richardson wrote for the court. His printing demonstrated excellent motor control, evenly formed letters,

smooth line quality and ability to draw small dots and circles. This is inconsistent for someone with the lack of use in three fingers. During the interview Mr. Richardson also stated that he does not sleep well and paces back and forth in his cell. He also stated that he has flashbacks where he hears gunshots of the police. He stated that he has a rash on his body, back problems, and that his heart pounds a great deal. Mr. Richardson complained of frequent panic attacks. All of these symptoms were consistent with Mr. Richardson's previous complaints. During this evaluation Mr. Richardson also stated that he was very wary and fearful of the guards. At the beginning, he looked up several times when the guard went by the window. However, as testing proceeded, he did not do this. Visiting hours came and went twice during testing and Mr. Richardson hardly looked up. People with PTSD often have a heighted startle response to noises and usually tend to be highly vigilant. Consistently during the testing, as we were seated by the front door, there was a loud clanging as the metal automatic door opened and shut. The examiner found this noise to be quite grating and intrusive. It is a foreboding sound often used in movies to represent being trapped. Mr. Richardson did not appear to notice it.

At the outset of testing there was a white envelope from Mr. Richardson's attorney sitting on the table. He stated that he thought his attorney was going to visit him that day and this is why the envelope was there. He then stated that he knew the examiner was coming and that his attorney was coming also. The attorney never came. At the end of testing, Mr. Richardson calmly took the envelope and took out pictures of his injuries taken when he was apprehended. He asked the examiner if she had seen them, which she had not. He asked if she would like to view the pictures and the examiner viewed the photos. It appeared as if Mr. Richardson consciously planned to bring the pictures to show the examiner, but made it appear as if they were there by accident.

Mr. Richardson stated that he is suffering from very serious and chronic headaches, mental confusion, poor memory, and lack of concentration. Testing persisted for 4 hours; through 2 visiting hours and, most likely, lunch. During this time Mr. Richardson complained frequently of not being able to understand or remember questions, but demonstrated good persistence and attention to all of the tasks. He put forth consistent energy and effort in pointing out to the examiner how disabled he was. For instance, Mr. Richardson was not able to interpret the proverbs on the WAIS-III. He stated, "I know the concrete sense but not the meaning." This

examiner has tested hundreds of persons with concrete thinking. No one of these other tested individuals had the mental capacity to point out their concrete thinking, or even to know that their thinking was concrete. This is a level of reflection seen in persons of Average to above Average mental functioning. Throughout the testing, particularly on the MMPI-2, Mr. Richardson was very defensive and obsessive in his answers. The MMPI-2 was read to him to insure he understood all of the questions. He challenged, qualified, and obsessed over even simple attestations to a statement (it is a true-false format).

Mr. Richardson's initial demeanor did not persist throughout the testing. There were times when his face cleared of any emotional turmoil. He demonstrated a sense of humor and joked over several of the test items. There were also times when he appeared to become more demonstrative and strong in his presentation. This occurred when talking about his previous counselor at the prison. He felt that she did not listen to him and that she was always arguing with him. He was also very upset with the prison doctors who took him off of his medication for while. He felt that the doctor was trying to, "manipulate him." Mr. Richardson's mental abilities also appeared to fluctuate during the testing. During conversation his memory for events, focus, and reasoning was very good. He was able to converse on a level that suggested at least an Average IQ. Then, when formal testing would begin, Mr. Richardson became confused again, and seemed to have difficulty thinking clearly. More will be said about this when discussing the WAIS-III, as Mr. Richardson's pattern of responding suggested distortion, and was not consistent with typical patterns of either emotional turmoil or cognitive decline.

### INTELLECTUAL, COGNITIVE, & EMOTIONAL FUNCTIONING:

Testing with the WAIS-III indicates that Mr. Richardson is functioning at the Borderline intellectual range Verbally (VIQ – 75), at the Borderline range in Performance (PIQ – 73), and at the Borderline range in Full Scale (FSIQ – 72). A SS (Standard Score) of 72 is at the 3rd percentile for people in his own age group. It is believed that these scores are not an accurate reflection of Mr. Richardson's actual intellectual potential.

There are five possible explanations for Mr. Richardson's Borderline Mentally Deficient IQ:

    1) That he actually has an IQ in the Borderline range.
    2) That his IQ is being impacted by emotional factors.
    3) That his IQ is being impacted by organic factors.
    4) That he has significant learning disabilities
    5) That he is purposefully misrepresenting his abilities.

  The examiner will discuss each of the possible five explanations as the report continues:

  1) Mr. Richardson's scaled scores on the WAIS-III ranged from a scaled score or ss of 9 on Vocabulary, Picture Arrangement and Comprehension to a low of 2 on Arithmetic and Picture Completion. Persons with an IQ in the Borderline intellectual range typically have scores that range from a ss of 4 to a ss of 8. Mr. Richardson's ss of 2 on Picture Completion was particularly low. He was not able to see that a doorknob was missing from a picture of a door. This examiner tests individuals for the Department of Mental Retardation and the State Bureau of Rehabilitation, many of whom have Borderline IQ's. Mr. Richardson missed items on the Picture Completion and the Arithmetic subtest that are usually correctly performed by the above population. Mr. Richardson could not subtract 4 from 10 in his head. Typically people who have difficulty with math count on their fingers and get the answer correct. He did not do this, and as such, this was considered to be an indication that he was "faking bad."

  Mr. Richardson's school records from North Carolina were reviewed to obtain a measure of his "premorbid" IQ and intellectual potential. In the fall of his 8th Grade year, he took the Differential Aptitude Test. He scored at the 90th percentile in Verbal Reasoning, the 75th percentile on Numerical Ability, 85th percentile in Language Usage, and at the 85th percentile in a Composite of his Verbal Reasoning and Numerical Ability. As such, when compared to students in Grade 8 across the nation, he performed better than did 85 percent of his peers. This is equivalent to a Standard Score or SS of 115, and a projected IQ of 115 which is in the High average range.

  In Grade 9.6, Mr. Richardson took the CAT, another nationally normed achievement test. He scored at the 99th percentile in Memory, and at the 50th percentile in Analogies. He also scored at the 66th percentile on the Reading Total, at the 96th percentile on the Language Total, at the 73rd percentile on the Math Total, and at the 86th percentile on the Total Battery.

This test also yielded a CSI or Cognitive Skills Index of 115, which is an impressive score in the High Average range. The CSI describes an individual's achievement on this aptitude test. It compares a student's cognitive abilities with that of students who are at the same age, without regard to grade placement. The CSI is a normalized Standard Score with a mean of 100 and a Standard Deviation of 16. As such, Mr. Richardson's CSI of 115 which was a score that was approximately one Standard Deviation above the national mean for his peers, or within the High Average range of cognitive functioning.

The achievement scores and CSI which are noted above indicate that in the 8th and 9th Grades, Mr. Richardson was a student with at least High Average abilities. Mr. Richardson may have begun to experience personal difficulties in 10th Grade as his scores went significantly down. In 10th Grade he failed Geometry with a final score of 57 and/or letter grade of F, and in 11th Grade his final score in Geometry was a 71 and/or a letter grade of D. This was from a student with a previous achievement in Numerical Ability that was at the 75th percentile in Numerical Ability, and at the 73rd percentile in Math Total. In April of 1992 Mr. Richardson took the SAT's and obtained a 360 Verbal and 380 Math and 740 Total. In May of 1992, he again took the SAT's and obtained a 340 Verbal and a 420 Math, and a 760 Total. Statistically speaking, a person with a previous CSI of 115 would be expected to perform approximately one Standard Deviation above the mean on the SAT's, and would have projected scores of approximately 500 Verbal, 500 Math, and 1000 Total. Something was apparently going on which was causing Mr. Richardson to achieve significantly below expectation for a person with his previously tested cognitive and achievement scores. This is outside of the scope of this exam but does suggest that, given his later infractions with the law, this was a period of change for the worse for Mr. Richardson.

In response to the above question, Mr. Richardson's intellectual potential is clearly at least Average to above. It is possible for a person to do worse on cognitive testing because of various emotional and personal factors. It is not, however, possible for a Borderline IQ to have tested at the High average range in 9th grade. This does not happen.

2) Emotional factors will impact one's functioning on the WAIS-III. People with depression, anxiety, and PTSD might show some slowing in their performance due to psychomotor retardation, or trouble concentrating

and need items to be repeated. Given Mr. Richardson's Average intellectual potential there is no emotional reason that he should not be able to perform simple math in his head. There is no reason based on his earlier test results that would provide a reasonable explanation as to why he could not do the simple Block Designs on the WAIS-III. His Digit Span on the WAIS-III was significantly lower than one would find in an Average IQ suffering from depression or anxiety unless they were in a psychotic state. The types of errors Mr. Richardson made were not consistent with an emotional disorder. This is not to say that his protocol was not impacted by emotional factors, but rather that many of the cognitive limitations he demonstrated were consistent with organic disorders and learning disabilities and not to the way emotional factors limit or influence functioning.

    3) The types of errors Mr. Richardson made on the Arithmetic subtest, the Block Design subtest, the Picture Completion subtest, and the Digit Span subtest of the WAIS-III could be consistent with an organic disorder, traumatic brain injury, or some lesion or disease of the brain. However, people with TBI typically demonstrate a lowering of their overall cognitive efficiency and may score some 10 to 20 IQ points lower than their potential. Mr. Richardson does not have any history of TBI. In addition his pattern or lower scores is peculiar, particularly his very poor arithmetic subtest. He would have to have significant damage to his brain to not be able to perform the addition of one digit numbers. The examiner has tested many persons with TBI who have been in comas for weeks and rehabilitation for many months. All of them, with Average or Low Average IQ's, could perform simple addition in their head, and were able to see that the door in Picture Completion was missing the doorknob. In addition, well learned material, such as simple math facts, are typically well retained in the case of brain injury.

    Mr. Richardson also complained of blurred vision and difficulty with visual acuity. As such, on the Matrix Reasoning subtest, and most of the Performance subtests, Mr. Richardson complained that he could not see the material clearly, that he could not figure out the pattern, or that he was limited in his ability to perform a visual-spatial task. Other aspects of the testing indicated that Mr. Richardson's visual acuity was very good. On the Vocabulary subtest of the WAIS-III he was given the words printed in a book to look at. At this point he was standing in the corner of the room to rest his back. The book was about 6 feet away from him and on an angle. He had no difficulty reading the words. The other important point to

remember is that visual perception is very different from visual acuity, which is different from nonverbal reasoning. Mr. Richardson's performance on visual tasks demonstrated that his visual acuity was very good. He had no difficulty noticing the subtle nuances of the Picture Arrangement subtest pictures. As such he cannot attribute his poor nonverbal reasoning to his "blurred vision". Most of the time he gave up stating that he could not "see" the stimulus. However, on the Picture Arrangement subtest, which consists of fairly complex pictures to sequence, he performed in the Average range.

4) Mr. Richardson has no history of learning disabilities. His prior math scores reviewed in his school records were at least in the Average range. Mr. Richardson was never in special education.

5) It is the opinion of this examiner that because the first four possible explanations have been ruled out as being the cause of his lowered WAIS-III IQ scores, that the only remaining explanation or conclusion is that Mr. Richardson significantly and purposefully distorted his abilities to appear disabled. It is true that trauma may disturb one's ability to concentrate, but not to the point of losing math skills. On the Block Design subtest Mr. Richardson worked very slowly. However he did not, as most subjects do, perform a 'trial and error" approach if he did not how to do the design. He would sit there, let time go by, and state how confused he was. After considerable time (usually when time was up) he would slowly put the pieces in place. This is not how a subject performs when he either does not get it or he is confused. Mr. Richardson was however, able to explain his failures on the Block Design. He stated that he could do the items where the blocks were "solid" colors but not the ones where you had to break up the design by using the blocks that were half white and half red (cut on the diagonal). The problem with his explanation of his difficulties on the Block Design subtest is that he actually performed five designs where you had to do this, and he got the orientation correct. One of the key difficulties with organic cases is their tendency to rotate the design, which is not what he did. Again, one sees a keen ability to "explain" his disability, which is not typical of persons who are actually disabled.

Another inconsistency was Mr. Richardson's performance on the Similarities subtest of the WAIS-III. This is an important subtest as it measures ones ability to use verbal abstract reasoning and think in a logical manner. Mr. Richardson obtained a ss of 4, which is equivalent to a SS of

70, which is at the cusp of the Mentally Deficient range. Mr. Richardson's responses were very concrete. For instance, when asked how a dog and lion were alike he stated that, "they both bite" (1-point answer out of 2). When asked how a boat and automobile were alike he stated, "You ride in both." He then went on to meet the discontinue rule. The examiner went on to test the limits. He was asked how praise and punishment were alike. This is a high level question. He responded that they were something your mother might give to you, that they were a form of discipline. Very nice answer, this is a 2 point or fully correct response. He was asked how hibernation and migration were alike. He stated, "Bears hibernate and birds migrate. They are both forms of change for animals, when there is a change of seasons." Once again a very nice answer, 2 points. This level of answer is at least the Average to High Average level. Another example of why it is felt that Mr. Richardson is trying to exaggerate his disability. His problems with his success is that he was not consistent in his cognitive problems.

Testing with the MMPI-2 is consistent with a person who is malingering, with gross exaggeration of clinical symptoms. The Validity Scale configuration is consistent with a marginally valid profile that should be interpreted with, "great caution." A person with this validity profile presents more problems or tries to appear more psychologically disturbed than they may be. A significant statistical technical consideration in understanding Mr. Richardson's Validity Profile is that he obtained an F Scale – K Scale ratio of 30. An F – K score of 12 or greater is generally accepted as being a strong indication that the profile is invalid because of symptom exaggeration. As such, Mr. Richardson has presented a significant "fake bad" profile. The F Scale measures a person's tendency to exaggerate one's problems, symptoms, and adjustment, and Mr. Richardson's scores was a T-Score of 80, which is significantly elevated. The K Scale is a measure of test defensiveness. The L Scale is not pertinent in this case. For one thing it is within normal limits. When elevated, the L Scale tends to isolate people who are, "faking good," or who are trying to downplay or deny their symptoms.

Another important point in interpreting Mr. Richardson's MMPI-2 profile was that he obtained significant elevations on 8 out of 10 of the clinical scales. This is very highly unusual. Further, his elevations on some of the scales were beyond interpretation for clinical utility, and as such, they are suggestive of exaggeration. For example, his score on Scale 2 (Depression) was a T-105. A cutoff of T-65 is used to determine a

significant level of depression. A T-105 is 5.5 Standard Deviations (SD) from the mean, and 4 SD from the clinical cutoff. If Mr. Richardson were actually this depressed, he would have been in a state resembling catatonia and unable to take the test, or even respond to test items. His score on Scale 8 (Schizophrenia) was a T-110, or 6 SD above the mean. A hospitalized person suffering from Schizophrenia, even in its most acute phase, would not be expected to score above a T-85. Scores above this on Scale 8 are usually only produced by people who are deliberately exaggerating the severity of their symptoms. In short, the MMPI-2 is highly suggestive of an attempt to "fake bad."

Mr. Richardson was previously tested with several rating scales. Two were rating scales that relied on self-report, and one was a clinician reporting scale. Mr. Richardson was reported to have, "extremely high scores" on these rating scales. Several points must be made. Self-reports are very vulnerable to bias, unless there is a built-in validity scale. Any person who scores at the very high range of any self-report evokes a concern for the validity and honesty of the self-report. In actuality, Mr. Richardson's "extremely high scores" on the rating scales actually support the exaggerated response style found on the MMPI-2. As mentioned above, the MMPI-2 is often utilized as the main instrument in forensic cases and has national recognition as a valid and reliable instrument. The C Mississippi PTSD Scale is a civilian version of a scale originally written for military personnel (Mississippi Scale for Combat-Related PTSD). A recent review of the scale (measurementexperts.org) indicates that the scale scores correlate more highly with scores on non-PTSD stress measures than with other measures of PTSD. This scale is more successful in correlating with depression and anxiety, suggesting it is a measure of a general level of distress rather than a measure of PTSD. As such, a high score measures self-reported distress, not PTSD, and one certainly cannot generalize from a civilian population to a population of military combat survivors.

## CONCLUSIONS:

Brian Richardson was tested by this examiner to assess for malingering or purposeful exaggeration of his symptoms for personal gain. This examiner would agree that Mr. Richardson is indeed suffering from some anxiety and depression, most likely due to being incarcerated. This examiner concludes that Mr. Richardson has an exaggerated and clinically

invalid test protocol that is consistent, in the present context, with malingering and a gross distortion of symptoms for personal gain.

Liane M. Pioli, Ph.D.
Licensed Psychologist

