UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIAN RICHARDSON

                Plaintiff(s)    X    CIVIL CASE NO.
                               3:01CV1719 (JCH)

    -vs-                  X

WILLIAM MIRANDA, ET AL

                         X    JANUARY 22, 2004
                Defendant(s)

SESSION I

DEPOSITION OF DAVID READ JOHNSON, Ph.D.

Pretrial deposition taken in the above-entitled

action on behalf of the defendant(s), before Dawn C.

Cuff, Lic. No. 00142, a Notary Public, pursuant to

the Practice Book Civil Rules of Procedure, at the

Office of the City Attorney, 999 Broad Street,

Bridgeport, Connecticut.

COMPUTER REPORTING SERVICE - (203) 234-1144

1
2    reading?

3        A    He was able to read.  I just do the test

4    this way in order to prevent any variation based on

5    that.  And then, of course, because it's a clinical

6    interview, as I'm reading the different symptoms, I'm

7    watching his behavior in response to the things.  So

8    I'm also evaluating his response to this.  This is

9    both for the issue of malingering and overreporting,

10   as well as for authenticity in terms of what's really

11   bothering him.  Because you will often see in a

12   person's nonverbal behavior aspects of things that

13   they are reacting to when they list these symptoms.

14   There are so many that there's no way that they can

15   anticipate what's coming next, so to speak.

16       Q    And you did that for each of the 90 areas

17   here?

18       A    Uh-huh.

19       Q    Is this particular test that you provided

20   to him one that is a subjective test; in other words,

21   it's based on what he tells you?

22       A    Yes.

23       Q    And the next test which you have here is

24   the Civilian M-PTSD.  How long did it take you to

25   give him this test?

JOHNSON, Ph.D. - DIRECT - BRAZZEL-MASSARO      126

1
2    A    This also took about 20 minutes.

3    Q    Once again, when you did this test, did you

4    have him read it and do the answers or did you read

5    it?

6    A    I read it.

7    Q    And when you read it to him and you wanted

8    him to provide the responses, did you read it and

9    then read the responses?  The first one, for

10   instance, is:  "In the past I had more close friends

11   than I have now."

12   A    No.  In this test I give him the scale of 1

13   to 5 and I indicate that 1 is that the statement is

14   not at all true, it never happened, and 5 is it

15   happens very much so and 3 is in the middle.

16        This is a test that, while it was one of

17   the first tests of PTSD, it is subject to

18   overreporting.  This is because it's obvious what one

19   should say if one wants to indicate that they're

20   PTSD.  So I use it to try to catch people

21   overreporting.

22        The two ways that I do that is I compare

23   this test score with the CAPS, which is a much more

24   conservative test.  If the two scores are matching,

25   it's suggestive not of overreporting.  If this test

1    is much higher than the CAPS, it suggests

2    overreporting.  If it's under, it suggests, you know,

3    underreporting.

4         Secondly what I do is I call it "testing

5    the limits."  Because on this test it's so obvious

6    what the right answer should be.  Once I get a middle

7    level answer like a 2, 3 or a 4, I will then repeat

8    the question and give a signal to the client that I'm

9    willing to hear a more extreme response.  And these

10   are indicated here.  Like if he says, "Well, it

11   happened pretty much," I'll say, "Only pretty much?"

12   Most malingers cannot help but take the hint and say,

13   "Well, actually, it happened more often than that,

14   or, "Yes, it was a 5."  The truth teller will hold to

15   their answer.  You'll see them think and then they'll

16   say, "No, no, it was that."  So they won't move.

17        I'll do that four or five times during the

18   test.  That's to evaluate not just the overreporting,

19   but also the tendency to try to -- when I give them a

20   signal, I'm willing to get something more.  They'll

21   shift their response.  So that's why this test is

22   very important in terms of being able to pick up on

23   PTSD, overreporting and malingering, you know, people

24   taking advantage of the interview.

JOHNSON, Ph.D. - DIRECT - BRAZZEL-MASSARO    128

1

2    Q    Is this considered a diagnostic test for

3    purposes of PTSD?

4    A    Yes.  And it's actually a highly reliable

5    test.  It's used all over the place.  There's a score

6    of 107 you have to get in order to have a diagnosis

7    for PTSD.  It's been supplanted by the CAPS, which is

8    a more conservative test, a more well-organized test.

9    But I still use this for the purpose that I just

10   described.

11   Q    And what about the SCL-90-R?  Is that a

12   diagnostic test?

13   A    Yes.  It's like a shortened version of the

14   MMPI.  It will give clusters of symptoms and, also,

15   it will give me an indication of overreporting.

16   Which in this case Mr. Richardson indicated there was

17   some overreporting on the SCL-90.

18   Q    In the MMPI, there are subscales regarding

19   areas that would talk about overreporting or

20   malingering, if you want to call it?

21   A    Yes.

22   Q    Did you provide him with any of that

23   information, any of those questions that would be

24   part of the MMPI?

25   A    The SCL-90 does not have specific scales

JOHNSON, Ph.D. - DIRECT - BRAZZEL-MASSARO    129

1

2    for that and they have ways of determining

3    overreporting, which are basically looking at the

4    number fours that the person has. And you'll see

5    that. You know, it's elevated. Now, it can be

6    elevated not because the person is overreporting, but

7    because, in fact, they're really ill. But it raises

8    the possibility of overreporting when you see the

9    kind of patterns that you do sometimes.

10       Q    You indicated on the SCL-90-R that there

11   was some indication of overreporting by

12   Mr. Richardson.

13       A    Yes.

14       Q    As a result of that, did you determine that

15   it would be a good idea to give him the MMPI; in

16   particular the subscales that talked about the

17   overreporting?

18           I didn't need to. It would be interesting

19   to do that, I suppose, if you were going to do a

20   complete evaluation in general for him. It wasn't

21   relevant to the questions I had. What I needed to do

22   is find out is he malingering around his PTSD. The

23   two tests that I have been doing are more specific

24   than the MMPI.

25       A    The MMPI is very broad. There are 560

JOHNSON, Ph.D. - DIRECT - BRAZZEL-MASSARO    130

questions. So it's much more broad than you need in this particular case.

Q    On the Civilian M-PTSD that you have here, did you, when you gave him the test, however, say to him on No. 1 -- and I think that's where we were before we got way-laid -- say to him, "Was it not at all? Is it slightly true? Somewhat true? Very true Extremely true"?

A    On some of these I did that.

Q    On some of them did you also say, "If I gave you a scale from 1 to 5, how would you indicate the answer?"

A    That was the basic. That's what I did.

Q    What you did, then, is you would give him the premises of each particular question and then you'd say, "There's a scale of 1 to 5. How would you designate it on a scale of 1 to 5?"

A    Yes.

Q    The last test that you gave him, which was the CAPS test that you already discussed, can you tell me how long did it take for him to take this particular test?

A    This was about a half hour.

Q    Again, how was it that you conducted this

JOHNSON, Ph.D. - DIRECT - BRAZZEL-MASSARO     131

2    test?

3        A     In this case he isn't told about the scale.

4    I'm simply asking the questions that are listed here:

5    "Have you ever experienced any unwanted memories of

6    the event?"  So it's an open question.  And then he

7    talks about it.  He talks until I know the answer.  I

8    don't tell him to rate it on frequency and intensity.

9    "Just tell me about it."  He doesn't know what the

10   numbers are.  He doesn't know what the things are.  I

11   basically just do it until I'm convinced of the

12   scoring.

13       For example, C is the current, like in the

14   last month, and the lifetime means it's worse than

15   it's ever been.  So I'll ask him both in terms of now

16   and also, you know, "Has it gotten better than before

17   or was there sometime that it was worse?"  And that's

18   always connected to the event that we're evaluating.

19   So this was related specifically to memories of the

20   April 22nd incident.

21       Q     So you didn't discuss any other incidents

22   of any other part of his life for purposes of this

23   test?

24       A     Right.  This is specifically to evaluate

25   whatever symptoms might be coming from that April

JOHNSON, Ph.D. - DIRECT - BRAZZEL-MASSARO    132

22nd. Again, it's a self-report measure, but I'm watching his responses and I'm evaluating him in terms of intensity and frequency.

Q    When you were asking him about this event for purposes of the CAPS, had you already determined what the traumatic event was?

A    Yes. The traumatic event was the incident of April 22nd, from the time that the robbery began until the time he was apprehended and taken into the custody.

Q    Did you include in the traumatic event the actual robbery itself?

A    Yes. The traumatic event was that evening. So that in general. He would identify, if you asked him, that being shot at and being beaten were the two traumatic incidents. What you're looking for, as you go through this, is not just some kind of general statement like, "Boy, I'm stressed about that." You're listening for specific markers, connections, parallels between the traumatic event and his symptoms now. Sometimes you get those. Sometimes it's a little vague. You keep asking until you get as much clarity as you can about each symptom.

Q    Maybe I'm having some difficulty, but the

JOHNSON, Ph.D. - DIRECT - BRAZZEL-MASSARO      133

1   traumatic event that you're indicating is the event

2   that caused him to have the PTSD.  There's no one

3   specific action that occurred on April 22, 2001 that

4   you're pinpointing as the traumatic event that was

5   the turnaround, in other words, that created this

6   particular event?

7        A    Well, this is what I'm trying to evaluate.

8   I'm listening for that.

9        Q    What did you determine, as a result of your

10  evaluation of Mr. Richardson, was the traumatic

11  event?

12       A    There were two:  He was terrified by being

13  shot at; he thought he was going to be killed by a

14  bullet, and he was overwhelmed and traumatized by the

15  beating that he alleged had.  The physical beating

16  and the humiliation and the racial slurs.  That part

17  of it.  So those would be two specifics.

18       Q    What were the facts that you determined

19  that supported each of those being the traumatic

20  event?

21       A    His response while he was reporting it.

22       Q    His response where and when?

23       A    The pattern of symptoms that he's

24  describing, the medical record shows some evidence of

COMPUTER REPORTING SERVICE - (203) 234-1144

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIAN RICHARDSON

                    X       CIVIL CASE NO.
        Plaintiff(s)       3:01CV1719 (JCH)

     -vs-           X

WILLIAM MIRANDA, ET AL

                    X     JANUARY 22, 2004
        Defendant(s)

SESSION I

DEPOSITION OF DAVID READ JOHNSON, Ph.D.

Pretrial deposition taken in the above-entitled

action on behalf of the defendant(s), before Dawn C.

Cuff, Lic. No. 00142, a Notary Public, pursuant to

the Practice Book Civil Rules of Procedure, at the

Office of the City Attorney, 999 Broad Street,

Bridgeport, Connecticut.

JOHNSON, Ph.D. - DIRECT - BRAZZEL-MASSARO          86

1     confidence in that.  Also, the medical record.

2          Q     Let's go to behavior in the interview.

3     Tell me what in the behavior in the interview made

4     you believe that you had facts to support post

5     traumatic stress disorder?

6          A     He was hypervigilant.  He showed signs of

7     hyperarousal, dissociation, psychogenic amnesia,

8     concentration and attention difficulties,

9     interpersonal avoidance, intense anxiety when

10    discussing aspects of the trauma, behaviorally,

11    scanning of the environment, speech disruption,

12    incongruities that are consistent with the disorder.

13    Many other things, actually.  And then, of course,

14    his responses on the tests, which are designed to

15    reveal malingering and exaggeration.

16         Q     Wasn't there a test that specifically

17    addresses malingering that you did not give him?

18         A     There are many tests that do that.  Are you

19    referring to the TOMM, T-O-M-M?

20         Q     Is that one test that will test

21    malingering?

22         A     That's one.

23         Q     You didn't give him that test, though,

24    right?

1

2      Q    Is this considered a diagnostic test for

3   purposes of PTSD?

4      A    Yes.  And it's actually a highly reliable

5   test.  It's used all over the place.  There's a score

6   of 107 you have to get in order to have a diagnosis

7   for PTSD.  It's been supplanted by the CAPS, which is

8   a more conservative test, a more well-organized test.

9   But I still use this for the purpose that I just

10  described.

11     Q    And what about the SCL-90-R?  Is that a

12  diagnostic test?

13     A    Yes.  It's like a shortened version of the

14  MMPI.  It will give clusters of symptoms and, also,

15  it will give me an indication of overreporting.

16  Which in this case Mr. Richardson indicated there was

17  some overreporting on the SCL-90.

18     Q    In the MMPI, there are subscales regarding

19  areas that would talk about overreporting or

20  malingering, if you want to call it?

21     A    Yes.

22     Q    Did you provide him with any of that

23  information, any of those questions that would be

24  part of the MMPI?

25     A    The SCL-90 does not have specific scales

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**COPY**

---

BRIAN RICHARDSON

    Plaintiff(s)  X  CIVIL CASE NO.
              3:01CV1719 (JCH)

   -vs-     X

WILLIAM MIRANDA, ET AL

    Defendant(s)  X  MAY 5, 2004

---

SESSION II

DEPOSITION OF DAVID READ JOHNSON, Ph.D.

Pretrial deposition taken in the above-entitled
action on behalf of the defendant(s), before Dawn C.
Cuff, Lic. No. 00142, a Notary Public, pursuant to
the Practice Book Civil Rules of Procedure, at the
Post Traumatic Stress Center, 19 Edwards Street, New
Haven, Connecticut.

COMPUTER REPORTING SERVICE - (203) 234-1144

JOHNSON, Ph.D. - DIRECT - BRAZZEL-MASSARO          129

1     for that and they have ways of determining

2     overreporting, which are basically looking at the

3     number fours that the person has. And you'll see

4     that. You know, it's elevated. Now, it can be

5     elevated not because the person is overreporting, but

6     because, in fact, they're really ill. But it raises

7     the possibility of overreporting when you see the

8     kind of patterns that you do sometimes.

9         Q    You indicated on the SCL-90-R that there

10    was some indication of overreporting by

11    Mr. Richardson.

12        A    Yes.

13        Q    As a result of that, did you determine that

14    it would be a good idea to give him the MMPI; in

15    particular the subscales that talked about the

16    overreporting?

17        I didn't need to. It would be interesting

18    to do that, I suppose, if you were going to do a

19    complete evaluation in general for him. It wasn't

20    relevant to the questions I had. What I needed to do

21    is find out is he malingering around his PTSD. The

22    two tests that I have been doing are more specific

23    than the MMPI.

24        A    The MMPI is very broad. There are 560

COMPUTER REPORTING SERVICE - (203) 234-1144

JOHNSON, Ph.D. - DIRECT - BRAZZEL-MASSARO          160

by Mr. Richardson, I believe, back in September of

2001?

    A    I don't believe 1 was given that.

    Q    Do you recall receiving a Complaint that

was basically in handwriting explaining an allegation

against the police officers?

    A    I'm almost certain that I did not get that.

    Q    So that Complaint that you received, along

with a medical records, was the Complaint that was

filed by counsel for Mr. Richardson?

    A    Yes.

    Q    What is the purpose of having the Complaint

for your evaluation?

    A    It simply gives me the context of the

complaints, the allegations or whatever made by the

plaintiff.  That gives me a context for the

evaluation.

    Q    What were you looking for in the Complaint

specifically?

    A    I'm not looking for something specific.

I'm just looking for the nature of the complaint,

what is being alleged by the plaintiff, and if

there's a particular angle or set of conditions that

the plaintiff is attempting to prove.  I am not doing

COMPUTER REPORTING SERVICE - (203) 234-1144

1  a legal evaluation of the case; I'm doing a

2  psychological one.  But sometimes it can be helpful

3  in determining malingering.  But there's nothing

4  specific I'm looking for other than the context.

5      Q    The Complaint that you received from

6  Attorney Kalish, what portions of that Complaint did

7  you find relevant to your review of Mr. Richardson

8  for this action?

9      A    I'd have to look at that.  I don't think I

10  have it here.  For some reason I did not get that

11  back.

12      Q    I have a Complaint here dated July 18,

13  2003.

14      A    Yes.

15      Q    Just for the record, that Complaint is the

16  Complaint that you reviewed for purposes of your

17  evaluation of Mr. Richardson?

18      A    Yes.

19          MS. BRAZZEL-MASSARO:  Did we have that

20          marked before?  I thought we did.

21          MR. HEATH:  Yes.  Exhibit 7 is a cover

22          letter, then the First Amended Complaint.

23      A    The major items I noted were that the

24  plaintiff claimed to have been fired at, and on page

1  A    Not at that point.

2

3  Q    At some point did you ask for further

4  information?

5  A    After my evaluation, I did sit down with

6  Dan Kalish, and I did say that I had noted severe

7  intellectual deficits in his responses to my mental

8  status exam.  I told Mr. Kalish that I was not able

9  to determine exactly the nature of his intellectual

10  functioning.  I asked him whether or not it would

11  make sense for me to come back to do that or whether

12  or not that would not be relevant to any conclusions

13  concerning post traumatic stress disorder.

14  He basically said to me that it was up to

15  me to make that determination.  And I said I would

16  get back to him in a day or two once I thought about

17  it.  And I did get back to him.  I told him that at

18  this point I could make a report on post traumatic

19  stress disorder and the issue of malingering without

20  doing a further evaluation, and if that was

21  sufficient for his purposes, there would be no need

22  for me to come back and do an intellectual

23  assessment.

24  Q    Now, when you do the intellectual

25  assessment, tell me specifically what it was that you

1    the evaluation?

3         A    I said that I had not done a complete

4    intellectual assessment and that there was evidence

5    of intellectual deficits.  Yes.

6         Q    When you say "evidence of intellectual

7    deficits," are you talking about traumatic brain

8    injury?

9         A*   Mostly, yes.

10        Q    His failure to be able to subtract simple

11   numbers like ten minus seven, is that an example of

12   something that would be akin to traumatic brain

13   injury?

14        A    That one fact can be attributed to many

15   different conditions.  The critical issue was whether

16   or not I could rule out malingering without it, which

17   I ended up feeling I could do.  So I did not do it,

18   because the pattern of his response was

19   contradictory.

20             For example, he said that he was very

21   interested in math and science in college and in high

22   school, yet he couldn't subtract, you know, simple

23   numbers.  So there was some kind of contradiction

24   there.  He said he had gone to a year or two of

25   college.  This was questionable given his current

1  been a problem for him.

2      Q    What would be the causes of the

3  intellectual deficits that you believe Mr. Richardson

4  has at this time?

5      A    The rule-outs, as we call it, would be

6  traumatic brain injury from a head injury of some

7  kind at some point in his past, brain damage from

8  substance abuse.  It could also have been from birth,

9  just constitutional low IQ.  And it's possible it

10  could be from some kind of disease process such as a

11  stroke or something like that.  The last one would be

12  malingering.

13      Q    Now, you actually gave, I believe in your

14  evaluation, three findings as to Mr. Richardson.  I

15  believe the first was the post traumatic stress

16  disorder.  The pages aren't numbered, but I think

17  it's page 3 where you talk about formulation.

18      A    Yes.

19      Q    The first is post traumatic stress

20  disorder, the second is major depression, and the

21  third is somatization disorder.

22      A    Yes.

23      Q    Can you tell me what facts you had that led

24  you to determine that Mr. Richardson was suffering

1  if they see something or they become acutely anxious,

2  their muscles just all, you know, tense up like it's

3  a normal response.  But they may be doing that

4  thousands of times a day.  This tensing over time

5  begins to impact on the joints in the neck and the

6  back and they develop this.  So it's a stress

7  response really.

8        . Over time it can actually lead to an

9  independent chronic pain condition that actually

10  deteriorates the joints in the neck and the back.  So

11  it leads sometimes to a very mixed picture later on.

12      Q    Is there a difference between malingering

13  and somatization disorder?

14      A    Yes.

15      Q    What is that?

16      A    Completely separate.

17      Q    What is that?

18      A    Malingering is essentially exaggerating or

19  lying, particularly for the purpose of secondary

20  gain.  Somatization disorder is an unconscious

21  illness and is psychosomatic, meaning that the

22  physical pain is not caused typically from a physical

23  injury; it's caused by psychological stress.

24      Q    Are there other causes for somatization

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

**COPY**

BRIAN RICHARDSON

           Plaintiff(s)   X   CIVIL CASE NO.
3:01CV1719 (JCH)

   -vs-          X

WILLIAM MIRANDA, ET AL
           Defendant(s)   X   MAY 5, 2004

---

SESSION II

DEPOSITION OF DAVID READ JOHNSON, Ph.D.

Pretrial deposition taken in the above-entitled action on behalf of the defendant(s), before Dawn C. Cuff, Lic. No. 00142, a Notary Public, pursuant to the Practice Book Civil Rules of Procedure, at the Post Traumatic Stress Center, 19 Edwards Street, New Haven, Connecticut.

COMPUTER REPORTING SERVICE - (203) 234-1144

JOHNSON, Ph.D. - DIRECT - BRAZZEL-MASSARO    166

1    be more into his intellectual functioning in the

2    intellectual assessment?  The memory impairment.

3        A    Yes.  What is your question?

4        Q    Would that be something that would be

5    related to post traumatic stress or would that be

6    something that's related to other difficulties that

7    Mr. Richardson may have?

8        A    It's possible that people have memory

9    deficits due to post traumatic stress disorder.

10   These are very certain ascribed aspects of the

11   traumatic experience.  However, that is unlikely in

12   his case.  He appears to have some kind of a broad

13   intellectual deficit.

14           For example, you want to look at school

15   records and to contrast his performance in school,

16   elementary school and middle school with his current

17   functioning to know whether or not he had a stroke.

18   Did he have a traumatic brain injury?  Is there some

19   other kind of process going on?

20       Q    And that would have given you a complete

21   evaluation of Mr. Richardson if you had done the

22   intellectual assessment?

23       A    There is no such thing as a complete

24   evaluation of anybody.  There's always something more

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIAN RICHARDSON

               Plaintiff(s)    X     CIVIL CASE NO.
                                         3:01CV1719 (JCH)

     -vs-               X

WILLIAM MIRANDA, ET AL

                        X     JANUARY 22, 2004
             Defendant(s)

SESSION I

DEPOSITION OF DAVID READ JOHNSON, Ph.D.

Pretrial deposition taken in the above-entitled

action on behalf of the defendant(s), before Dawn C.

Cuff, Lic. No. 00142, a Notary Public, pursuant to

the Practice Book Civil Rules of Procedure, at the

Office of the City Attorney, 999 Broad Street,

Bridgeport, Connecticut.

COMPUTER REPORTING SERVICE - (203) 234-1144

JOHNSON, Ph.D. - DIRECT - BRAZZEL-MASSARO          78

    Q    As you sit here, would that be relevant
information for you for purposes of making your final
determination?

    A    Possibly.

    Q    Employment history, as to the jobs that he
had, would that be important for you in helping you
to make a final evaluation?

              MR. KALISH:  Objection.  A final
              evaluation as to what?

              MS. BRAZZEL-MASSARO:  This case.

              MR. KALISH:  As to whether or not he
              has post traumatic stress disorder or
              whether or not it was caused by a
              particular event?

              MS. BRAZZEL-MASSARO:  I think just for
              his evaluation.

              MR. KALISH:  I'm going to object to it
              because it's vague.

    A    I've made my final evaluation.  All
information about him would be helpful in my
understanding the case.  There's no way to tell ahead
of time which information might actually affect my
final conclusions.  So I don't want to imply that
there's a particular piece of information that would

1   be required for me to make a final determination.

2       Q    Well, would it be helpful for you to have

3   had the transcripts of the criminal case in making

4   your final evaluation?

5           MR. KALISH:  Same objection.

6       A    Possibly.

7       Q    Would it have been helpful for you to have

8   any statements that he gave to police or to

9   individuals who were involved in his criminal action

10  in this case?

11      A    Possibly.

12      Q    Would it have been important for you to

13  have seen the Bridgeport Hospital reports and the

14  statements that were made by Mr. Richardson

15  immediately after his arrest on April 22, 2001?

16          MR. KALISH:  Same objection.

17      A    Possibly.

18      Q    Would it have been important for you to

19  have Mr. Richardson's college records as to what

20  happened to him when he was at college?

21          MR. KALISH:  Same objection.

22      A    Possibly.

23      Q    If I understand what you're telling me

24  today, none of that information was provided to you?